IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

| | | |
|---|---|---|
| JAMES SWAIN RIEVES, ET AL. | ) | |
| | ) | CASE NO. 3:18-CV-0965 |
| PLAINTIFFS, | ) | |
| | ) | Judge Aleta A. Trauger |
| V. | ) | |
| | ) | Jury Trial Demanded |
| TOWN OF SMYRNA, TENNESSEE, | ) | |
| ET. AL. | ) | |
| | ) | |
| DEFENDANTS. | ) | |

---

**PLAINTIFFS' RESPONSE TO DEFENDANTS RUTHERFORD COUNTY, TENNESSEE
AND SHERIFF MICHAEL FITZHUGH'S MOTION TO DISMISS**

---

**DAVID RANDOLPH SMITH & ASSOCIATES**

By: /s/ Christopher W. Smith
Christopher W. Smith, TN BPR #034450
David Randolph Smith, TN BPR #011905
Dominick R. Smith. TN BPR #028783
W. Lyon Chadwick. Jr. TN BPR #029599
1913 21st Avenue South
Nashville, Tennessee 37212
615-742-1775
csmith@drslawfirm.com
drs@drslawfirm.com
dom@drslawfirm.com
lyon@drslawfirm.com

*Attorneys for Plaintiffs*

/s/ Wesley Clark
Wesley Clark, #32611
Frank Brazil, #34586
Brazil Clark, PLLC
2706 Larmon Avenue
Nashville, TN 37204

*Attorney for Plaintiff Rieves*

## INTRODUCTION

Defendants Rutherford County and Sheriff Mike Fitzhugh's ("Fitzhugh") motion to dismiss should be denied on all counts:

1) Defendants' makeweight claim that Fitzhugh should be cloaked in "quasi-judicial immunity" merely for carrying out a court order—based on a false affidavit—fails as a matter of law;

2) Fitzhugh is not entitled to qualified immunity for his violation of Plaintiffs' clearly established rights because a reasonable officer would have known that there was no probable cause for the criminal charges levied against Plaintiffs; and the grand jury indictments do not protect Fitzhugh from his unconstitutional actions during the *investigative* phase of the Candy Crush operation, as the mere existence of an indictment, obtained by a false affidavit, does not transmute unconstitutional actions into immunized ones;

3) Plaintiffs' selective enforcement claims under 42 USC § 1983 survive, as Plaintiffs were targeted for their business size, an arbitrary classification, and for the clearly-alleged motive of financial gain through the abuse of civil forfeiture laws;

4) Plaintiffs' civil conspiracy claim under § 1983 survives because the Amended Complaint clearly alleges a "single plan" among the Defendants, including Fitzhugh's personal involvement in ensuring Operation Candy Crush would be executed despite the objections of his subordinates; and any defects in Plaintiffs' 1985(3) claim can be cured by Plaintiffs' Second Amended Complaint submitted contemporaneously herewith;

5) Plaintiffs' *Monell* claims against Rutherford County survive because Fitzhugh is a final decision-maker whose actions represent the policy of the County.

For these reasons, the motion to dismiss should be denied.

1

## Legal Standard Under Rule 12(b)(6)

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp*., 281 F.3d 613, 619 (6th Cir. 2002). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A*., 534 U.S. 506, 511, (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action;" instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678-79 (2009). "Only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id*. at 679; *Twombly*, 550 U.S. at 556. Moreover, a court "cannot dismiss for factual implausibility 'even if it strikes a savvy judge that . . . recovery is very remote and unlikely.'" *Courie v. Alcoa Wheel & Forged Prods*., 577 F.3d 625, 630 (6th Cir. 2009) (quoting *Twombly*, 550 U.S. at 556.

## FACTUAL ALLEGATIONS

With respect to Defendants Fitzhugh and Rutherford County, the First Amended Complaint ("FAC") (ECF 5) alleges the following facts:

### 1. Investigation.

Plaintiffs are owners of convenience stores, tobacco stores, and "vape shops" that sell a variety of tobacco products. FAC at ¶ 26. In addition to tobacco, Plaintiffs sold products

containing industrial hemp-derived cannabidiol ("CBD") which is legal under Tennessee and federal law[1]. *Id.* at ¶ 27. In or around February 2017, the Rutherford County Sheriff's Office ("RCSO") began investigating the sale of CBD products. *Id.* at ¶¶ 28-31. As part of the investigation, RCSO Officers purchased these products from Plaintiffs' stores and submitted them for testing by the Tennessee Bureau of Investigation ("TBI"). *Id.* RCSO Officers then contacted Defendant John Zimmerman, an Assistant District Attorney in Rutherford County, to "seek prosecutorial direction on the case." *Id.* at ¶ 32. The "direction" that RCSO Officers received from Zimmerman was to make more purchases of CBD products, including outside the city of Murfreesboro. *Id.* at ¶ 33. During this conversation with Zimmerman, a RCSO Officer "brought up to [Zimmerman] Amazon is selling [the same products.] [Zimmerman] laughed and said we aren't going after Amazon. He said go to vape stores." *Id.* at ¶ 34. RCSO Officers adopted this plan and executed it: they went to vape stores and did not investigate Amazon, a major online retailer. *Id.* ¶¶ 50-53.

From the inception of the investigation, RCSO Officers had serious doubts about whether the CBD products in question were in fact illegal. *Id.* at ¶¶ 36, 40, 44, 48. Another Officer wondered: "do people really know this stuff is illegal" and thought it "extreme to padlock/arrest." FAC Exhibit 2, "Interview Notes," p. 3. RCSO Major William E. Sharp detailed his concerns in a March 26, 2018 memo, titled "Narcotics Investigation of CBD oil." FAC Exhibit 4, "Memo of Major Sharp."

---

[1] In addition, the State of Tennessee, on its own website, acknowledges that industrial hemp produced in accordance with 7 USCS § 5940 is legal under both state and federal law: "Sec. 7606. Legitimacy of Industrial Hemp Research contained in the 2014 Federal Farm Bill, which was signed into law Feb. 7 [2014], provides for the cultivation of industrial hemp for purposes of research by institutions of higher education *or state departments of agriculture in states where it is legal*." TN.GOV, "Hemp Industry," available at https://www.tn.gov/agriculture/farms/hemp-industry.html, last visited December 20, 2018 (emphasis added).
Further, a recent Administrative Decision by the United States Postal Service clarified that CBD produced in accordance 7 USCS § 5940 is "an exception to the Controlled Substances Act, allowing the interstate transportation of industrial hemp, including CBD derived from it, so long as it complies with [7 USCS § 5940]." *KaB, LLC. v. United States Postal Service*, P.S. Docket No. MLB 18-39, November 8, 2018, available at http://about.usps.com/who-we-are/judicial/admin-decisions/2018/mlb-18-39-fd.htm, last visited December 20, 2018.

3

Major Sharp's memo reflects that in December 2017, Zimmerman told RCSO Officers they "needed to move quickly and have this done before (something said about legislation)." *Id.* at 1. Shortly thereafter, on January 12, 2018, Major Sharp was informed that "TBI does not feel comfortable testifying about the items being legal [*sic*]." *Id.* Major Sharp thus instructed other RCSO Officers "not to make any further buys and to stop any further investigation until I can get some answers." *Id.* On January 22, 2018, Major Sharp "briefed the sheriff [Defendant Fitzhugh] and [RCSO] Chief Grissom on this case. I advised the Chief I was not comfortable proceeding until I have further information." *Id.* On January 24, 2018, Major Sharp spoke with Defendant Jennings Jones, who "became upset about the T.B.I. and the testing." *Id.* As of January 30, 2018, according to Major Sharp, there was a "Consensus, no one is comfortable moving ahead at this time." *Id.* at 2. The next day, January 31, 2018, Major Sharp told Chief Grissom "I still have concerns with Narc case. I told him I'm leaning towards putting it off." *Id.* The day after that, February 1, 2018, Major Sharp met with Defendant Jones and detailed his specific concerns regarding the investigation. Among these were: "Legal or not . . . The owners lack of knowledge of it being illegal . . . Law suites [*sic*] . . . slowing the investigation down, letting the owners know their product may be illegal." *Id.*

At this point, "unsatisfied with Major Sharp's decision, the District Attorney's Office reached out to the highest level of command at the Sheriff's Office"—that is, Defendants Zimmerman and Jones went above Major Sharp and contacted Defendant Sheriff Fitzhugh directly. FAC Exhibit 1, "RCSO Investigative Report," at 4. Sheriff Fitzhugh "allowed for the District Attorney's Office to set up another meeting with Major Sharp and multiple narcotics detectives." *Id.* Defendant Fitzhugh, fully informed of the specific concerns of Major Sharp, nevertheless allowed the Operation, which involved arresting Plaintiffs and padlocking their businesses, to proceed.

4

## 2. Fabrication of Probable Cause and False Affidavits.

On February 12, 2018, when Operation Candy Crush was executed, the leading law enforcement officers, including Sheriff Fitzhugh, staged a televised press conference (the "Press Conference") in front of the Vapesboro store, owned by Plaintiffs Scott and Gina Ritter. FAC at ¶ 52. At this Press Conference, Defendant Kevin Arnold defended the actions of the law enforcement agencies by stating: "every one of these stores, the Judge approved the lock down." *Id.* at ¶ 65. In fact, Judge Royce Taylor approved the nuisance petitions on the basis of false affidavits submitted by Det. Beane, a RCSO Officer. *Id.* at ¶¶ 66-83. These affidavits were false in that they alleged the CBD products contained "marijuana extracts," when in fact they did not. *Id.* at ¶¶ 68-69. The affidavits alleged the products had been sold to children, which was false. *Id.* The affidavits alleged that the TBI "determined the candy had been laced with 'CBD,'" when, in fact, the TBI had never purported to make any claim regarding "lacing" products with CBD. *Id.* at ¶¶ 71-72. And in at least one case (Plaintiff Louis Shaun Berbert), the affidavit submitted by Det. Beane included a lab report that had been revised to specifically remove drug scheduling. *Id.* at ¶¶ 73-78. Det. Beane, along with Defendants Zimmerman and Jones, did not advise the Court that the report had subsequently been amended to remove the very scheduling on which they were now relying for their nuisance petition. *Id.*

With respect to the grand jury indictments referenced obliquely in Exhibit 1 to the FAC ("A couple of meetings transpired within weeks leading to the Grand Jury indictment,") Defendant Jennings Jones' Press Release (Exhibit 8 to the FAC), elaborates more fully on how these indictments were obtained:

> After all the TBI lab reports were received in this investigation, the information concerning the investigation coupled with the findings of the TBI lab were presented to the Rutherford County Grand Jury and then to Circuit Judge Royce Taylor. These TBI lab reports were filed with the court by my office and constitute public records. **The Grand Jury returned true bills because the TBI lab reports stated that the substances within the edible products contained illegal controlled substances**. The TBI lab reports and

5

reports of the investigations were also presented to Judge Taylor as part of a petition to declare these businesses as public nuisances under the law. State law declares that any building used in the selling of controlled substances constitutes a public nuisance. **Judge Taylor found probable cause that each business was operating as a public nuisance based, in part, upon the findings contained in the TBI lab reports that the products contained a Schedule VI controlled substance.** Judge Taylor then ordered law enforcement agencies to padlock each business pending a hearing in court . . .

Since the TBI lab cannot conclusively establish in court that the cannabidiol they detected was derived from a marijuana plant, the State cannot prove the substance is actually a Schedule VI controlled substance. **The TBI lab reports constituted the foundation of all indictments and nuisance actions in this case.**

FAC Exhibit 8, at 1-2 (emphasis added). The Press Release suggests that the information presented to the grand jury was substantially similar, if not identical, to the information presented to Judge Taylor as part of the nuisance petition. Jones states that the TBI lab reports and "information concerning the investigation . . . were presented to the Rutherford County Grand Jury *and then to Circuit Judge Royce Taylor*." *Id*. (Emphasis added.) Jones acknowledges that the criminal charges could not be sustained because "the TBI lab reports constituted the foundation of all indictments and nuisance actions in this case."

For its part, the TBI forcefully rejected Jones' contention that the TBI had "assured" his office that the CBD products at issue were "illegal controlled substances." FAC at ¶ 84. The TBI released a statement that read, in relevant part:

It is inaccurate for the local stakeholders in these cases to assert they made decisions in this case unaware of the limits of our forensic work . . .

We clearly explained—in detail—the limitations of our analysis to all stakeholders. We did so to ensure they fully knew that, though we could identify CBD, we were not able to identify its origin . . .

We also explained to them the nuance of the included schedule on our lab reports, which are provided as a courtesy. In this instance, we listed the schedule out of an abundance of caution because the sample could have met the standard for schedule as spelled out in the law. Local agencies and prosecutors — including those in Rutherford County — are well aware of that nuance.

6

FAC Exhibit 9, "TBI Stmt. Via Email," at 1-2. TBI thus insisted that it had specifically informed Jones of the "the limitations of our analysis" *before* the grand jury indictments and nuisance petitions were obtained. The TBI's statement is consistent with Major Sharp's memo, which records that on January 12, 2018, Major Sharp was informed that "TBI does not feel comfortable testifying about the items being legal." FAC Exhibit 4, at 1.

### 3. Civil Forfeiture and the Financial Motive.

The FAC alleges that Operation Candy Crush was undertaken, at least in part, for the improper financial motive of seizing funds from Plaintiffs' businesses through the use of civil forfeiture laws. FAC at ¶¶ 39-43; 109-115. As mentioned above, Defendant Zimmerman told Major Sharp that law enforcement "needed to move quickly and have this done before (something said about legislation)." FAC at ¶ 39. Exhibit 5 to the FAC is an email sent by Zimmerman, subject line "Bill just introduced," attaching a PDF file of proposed Senate Bill 2224.[2] *Id.* at ¶ 41. The proposed bill, in key and relevant part, would have amended Tennessee's civil forfeiture laws to specifically exclude CBD products. *Id.* The bill was first filed for introduction on January 31, 2018, approximately two weeks before Operation Candy Crush was executed and Plaintiffs were criminally charged. *Id.* at ¶ 42. Major Sharp's memo describes the crucial role that civil forfeiture played in the Candy Crush operation, recording that Zimmerman stated: "They [Plaintiffs] will come in on their court date, plead guilty, pay the fines and get their businesses open." "We will put off the court dates, attorneys will get tired of coming to court and settle." *Id.* at ¶ 43.

### 4. Fitzhugh's False and Defamatory Statements at the Press Conference.

At the Press Conference announcing the arrests and prosecutions of Plaintiffs, Defendant Fitzhugh made several false and defamatory statements deeply injurious to the professional reputations of all Plaintiffs. FAC at ¶¶ 54-60. Defendant Fitzhugh described

---

[2]     At the time of this filing, Plaintiffs possess only a redacted version of this email, produced by Rutherford County pursuant to an Open Records request. The identity of the recipient of this email is redacted.

Operation Candy Crush as a series of raids conducted on 23 stores for selling products "containing a marijuana derivative." *Id.* at ¶ 55. This was false. In fact, the CBD products sold at Plaintiffs' stores were not derived from "marijuana" and did not meet Tennessee's statutory definition of "marijuana." *Id.* at ¶ 56. Fitzhugh stated that law enforcement officers had obtained "other synthetic drugs in all 23 of these stores." This, too, was untrue. *Id.* at ¶¶ 57-59. Fitzhugh then made the bizarre accusation, completely unsupported by his own office's investigation, that the Plaintiffs had taken the candy products "out of the package" to "spray them with this illegal substance" and "then repackage them in a different package" at a marked-up price. *Id.* at ¶ 58. Even the false affidavit of RCSO Detective Curtis Beane did not charge that any Plaintiff had ever personally opened a package to deliberately infuse candies with illegal drugs. While that affidavit falsely stated the CBD products had been "laced" with illegal marijuana, no law enforcement officer ever claimed that the *Plaintiffs themselves* had "laced" these products and then repackaged them until Defendant Fitzhugh so stated at the Press Conference.[3]

## ARGUMENT

1. **Fitzhugh is not entitled to quasi-judicial immunity because 1) such immunity does not cover investigative acts; and 2) the court orders upon which he relies were obtained on the basis of a false affidavit.**

Defendant Fitzhugh claims he is entitled to absolute immunity ("quasi-judicial immunity") for his "actions . . . taken pursuant to a court order." Defs.' Mem., ECF 23, at 6. With respect to padlocking the Plaintiffs' businesses, Fitzhugh insists that because these actions were "done pursuant to a court order," they are "precisely the type entitled to quasi-judicial immunity." *Id.* Fitzhugh makes a similar claim with respect to the wrongful arrests

---

[3] Plaintiffs include Fitzhugh's defamatory statements to establish reputational injury as an element of damages to their claims for selective prosecution, false arrest, unlawful seizure, and unlawful prosecution. (*See Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986), noting that under 42 USC § 1983 "compensatory damages may include not only out-of-pocket loss and other monetary harms, but also such injuries as 'impairment of reputation . . . personal humiliation, and mental anguish and suffering.'") Fitzhugh's statements are also relevant to the qualified immunity discussion; and are included in this Response for that purpose.

of the Plaintiffs, arguing that the existence of grand jury indictments "conclusively determines the existence of probable cause" such that Plaintiffs' claims must fail. *Id.* at 7. (This latter argument is analytically not one of quasi-judicial immunity, but rather one purporting to negate an essential element, the lack of probable cause, of Plaintiffs' § 1983 Fourth Amendment claims.) These arguments fail in at least two respects: 1) quasi-judicial immunity does not attach to Fitzhugh for his *investigative* acts, *prior to* the execution of the court orders upon which Fitzhugh relies; and 2) the court orders in question were based on false affidavits and information, such that any presumption of probable cause is rebuttable and inconclusive.

### a. Quasi-judicial immunity does not attach to law enforcement officers performing investigative functions.

The Supreme Court has explained that "the presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties." *Burns v. Reed*, 500 U.S. 478, 486-87 (1991). The Court has been "quite sparing in [its] recognition of absolute immunity … and has refused to extend it any further than its justification would warrant." *Id*. (internal quotations and citations omitted.) "Generally, courts have been substantially less willing to grant absolute immunity to law enforcement officials performing investigative duties." *Spurlock v. Satterfield*, 167 F.3d 995, 1003 (6th Cir. 1999). In *Malley v. Briggs*, the United States Supreme Court rejected a state trooper's argument that he was entitled to absolute immunity in seeking an arrest warrant. 475 U.S. 335, 340-341 (1986). The Court explained:

> We have interpreted § 1983 to give absolute immunity to functions "intimately associated with the judicial phase of the criminal process," … not from an exaggerated esteem for those who perform these functions, and certainly not from a desire to shield abuses of office, but because any lesser degree of immunity could impair the judicial process itself … We intend no disrespect to the officer applying for a warrant by observing that his action, while a vital part of the administration of criminal justice, is further removed from the judicial phase of criminal proceedings than the act of a prosecutor in seeking an indictment.

*Id.* at 342-343. The Court, having thus rejected the trooper's claim to absolute immunity, further clarified the application of qualified immunity to the case, reasoning that "the central question" was "whether a reasonably well-trained officer in petitioner's position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant." *Id.* at 345. If so, held the Court, "the officer's application for a warrant was not objectively reasonable, because it created the unnecessary danger of an unlawful arrest," and even *qualified*, much less absolute, immunity would not shield the trooper. *Id.*

In the Sixth Circuit, "the swearing officer [of a] Complaint and Affidavit would not be entitled to absolute immunity. The only level of protection from suit that is potentially available when an official vouches for the truth of the contents of a criminal complaint is qualified immunity." *Webb v. Greene County Sheriff's Office*, 494 F. Supp. 2d 779, 789 (S.D. Ohio 2006), citing *Ireland v. Tunis*, 113 F.3d 1435, 1446 (6th Cir. 1997), cert. denied, 522 U.S. 996 (1997). Thus, even if Defendant Fitzhugh, rather than his subordinate, had personally sworn the affidavits in this case, he would not be entitled to absolute immunity.

Nor does the existence of a court order relieve Defendant Fitzhugh of liability for his unconstitutional actions taken in helping to secure that order by wrongly setting a prosecution in motion. In *King v. Harwood*, the Sixth Circuit considered whether absolute immunity for grand jury testimony protected officers' pre-testimonial acts. 852 F.3d 568, 590 (6th Cir. 2017). The Court held that such immunity does not extend to "actions that are prior to, and independent of … grand-jury testimony." *Id.* The Sixth Circuit explained:

> An officer's actions of *wrongly setting a prosecution in motion or falsifying or fabricating evidence* may be material to the grand-jury indictment even though they do not constitute "testimony" or related preparation for testimony, and *nothing in the caselaw indicates that such actions somehow mutate into grand-jury testimony* simply because they are material to the return of an indictment.

*Id.* (Emphasis added.) Like *King*, this case centers upon the unconstitutional actions of all Defendants in "wrongly setting a prosecution in motion;" and these wrongful actions do not

10

"somehow mutate" into immunized ones "simply because they are material to the return of an indictment." *Id.*

> **b. The grand jury indictments are based on a false affidavit and are rebuttable.**

In *King*, the Sixth Circuit held:

> Where (1) a law-enforcement officer, in the course of setting a prosecution in motion, either knowingly or recklessly makes false statements (such as in affidavits or investigative reports) or falsifies or fabricates evidence; (2) the false statements and evidence, together with any concomitant misleading omissions, are material to the ultimate prosecution of the plaintiff; and (3) the false statements, evidence, and omissions do not consist solely of grand-jury testimony or preparation for that testimony (where preparation has a meaning broad enough to encompass conspiring to commit perjury before the grand jury), the presumption that the grand-jury indictment is evidence of probable cause is rebuttable and not conclusive.

*Id.* at 587-588. The FAC clearly alleges facts fitting squarely within this rule. The affidavit of RCSO Det. Beane, either knowingly or recklessly, falsely claimed that: the Plaintiffs had sold CBD to children; the CBD products contained "marijuana extracts;" and the TBI "determined the candy had been laced with 'CBD.'" FAC at ¶¶ 66-78. And in the case of Plaintiff Louis Shaun Berbert, the affidavit submitted by Det. Beane included a lab report that had been revised to specifically remove drug scheduling. *Id.* at ¶¶ 73-78. Det. Beane, along with Defendants Zimmerman and Jones, did not advise the Court that the report had subsequently been amended to remove the very scheduling on which they were now relying for their nuisance petition. *Id.* Charitably understood, these actions were "misleading omissions" that were "material to the ultimate prosecution of the plaintiff." *King* at 587.

Defendant Fitzhugh makes the incorrect, but in any event, irrelevant observation that "there are no allegations that suggest the Sheriff knew that the court orders or arrest warrants were invalid or that any actions taken by the prosecutors were improper." (Fitzhugh's observation is incorrect in that the FAC alleges that Fitzhugh allowed Operation Candy Crush to proceed despite the clear objections of Major Sharp, who presciently voiced his doubts about the legality of the operation, including that TBI would not "testify that the

11

substances used are illegal." FAC at ¶¶ 44-50. The FAC alleges that the District Attorney's Office was "unsatisfied" with Major Sharp's decision and that two members from the District Attorney's Office met with Defendant Fitzhugh. *Id.* at ¶ 50. Shortly thereafter, Operation Candy Crush was executed. *Id.* Not only was Defendant Fitzhugh thus aware of the "improper" actions of the prosecutors, he in effect ratified those actions and adopted them as the official policy of Rutherford County, as will be discussed *infra*.) The observation is irrelevant for purposes of the presumption of probable cause usually afforded to grand jury indictments because, under the rule in *King*, neither Fitzhugh nor any other Defendant in this case can rely on the false affidavit of Beane under the circumstances of this case. *King*, at 588 ("If the proceeding [finding probable cause] is tainted—as here, by fabricated evidence— … the result is that probable cause is lacking"), citing *Manuel v. City of Joliet*, 137 S. Ct. 911, 920 (U.S. 2017).

2. **Fitzhugh is not entitled to qualified immunity for violating Plaintiffs' clearly established rights because a reasonable officer would have known that there was no probable cause for the criminal charges levied against Plaintiffs.**

Defendant Fitzhugh's claim to qualified immunity is based on an unduly narrow framing of Plaintiffs' § 1983 malicious prosecution claims. As Fitzhugh frames it, only an actual prosecutor can face liability for "the decision to prosecute a case in Tennessee." Defs.' Mem. at 9. But this conception is at odds with applicable federal law. Returning to *King* clarifies the limitations of qualified immunity for § 1983 malicious prosecution claims:

> Individuals have a clearly established Fourth Amendment right to be free from malicious prosecution by a defendant who has "made, influenced, or participated in the decision to prosecute the plaintiff" by, for example, "knowingly or recklessly" making false statements that are material to the prosecution either in reports or in affidavits filed to secure warrants. *Webb*, 789 F.3d at 660, 665 (holding officer violated clearly established right to be free from malicious prosecution by fabricating evidence that defendant was a drug dealer); *Smith*, 1996 U.S. App. LEXIS 6103, 1996 WL 99329 at *4-5 (holding reasonable police officer would have known that seeking felony warrants and making "efforts to get the Commonwealth Attorney to convene a grand jury" when probable cause was lacking violated clearly established constitutional rights); *see also Malley v. Briggs*, 475 U.S. 335, 340-45, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986) (affirming lower court's holding that "an

12

officer who seeks an arrest warrant by submitting a complaint and supporting affidavit to a judge is not entitled to immunity unless the officer has an objectively reasonable basis for believing that the facts alleged in his affidavit are sufficient to establish probable cause").

*King* at 582-583. The FAC clearly alleges that Defendant Fitzhugh "made, influenced, or participated in the decision to prosecute" the Plaintiffs. In fact, but for Defendant Fitzhugh's involvement, Operation Candy Crush would never have been executed, as Major Sharp's decision not to proceed with the law enforcement operation would have stood. The FAC further alleges facts sufficient to establish that a reasonable officer would have known that the Plaintiffs in this case had committed no crime—in fact, the FAC specifically names or alludes to such reasonable officers—to wit, Major Sharp and the other (names redacted) officers who reached the "consensus, no one is comfortable moving ahead at this time" based on several factors, including the TBI's refusal to support the case. FAC Exhibit 4, at 2.

Fitzhugh's statements at the Press Conference underscore the unreasonableness of his approach and decision-making. Fitzhugh made outlandish claims against the Plaintiffs that were completely unsupported even by his own office's flawed investigation. His public comments, made the same day that Operation Candy Crush was executed, provide a window into his miscomprehension of the Plaintiffs' alleged crimes. Where Major Sharp had openly wondered whether the Plaintiffs even knew the hemp products were illegal (which of course they were not), Fitzhugh publicly claimed the Plaintiffs personally infused the products with illegal drugs by opening the packages; spraying them with an "illegal substance;" and then "repackaging" these products at a markup in price. FAC at ¶ 58. Even considering "only the facts that were knowable to" Fitzhugh at the time, no reasonable officer could have seriously believed any of this to be true. *King*, at 582.

"A reasonable police officer would know that fabricating probable cause, thereby effectuating a seizure, would violate a suspect's clearly established Fourth Amendment right to be free from unreasonable seizures." *Spurlock,* 167 F.3d 995, at 1006. On these facts,

13

Defendant Fitzhugh unreasonably violated Plaintiffs' clearly established rights and is not entitled to qualified immunity.

### 3. Plaintiffs' selective enforcement claims under 42 USC § 1983 survive because Plaintiffs were targeted for their business size, an arbitrary classification, and for the clearly alleged motive of financial gain through the abuse of civil forfeiture laws.

Defendant Fitzhugh argues that Plaintiffs' selective enforcement claims fail because "the size of one's business is not a constitutionally protected category" and the FAC "does not allege that the actions taken by the Sheriff were as a result of ill-will or malice." Defs.' Mem. at 13. The latter assertion misreads the FAC, while the former claim misperceives the nature of a § 1983 selective enforcement claim. Dispensing with the latter claim first, the FAC alleges: "the reason Defendants did not prosecute Amazon or Wal-Mart was that these large commercial entities were unlikely to be as easily intimidated into paying fines and agreeing to forfeit property to resolve these unsupportable claims and criminal charges." FAC ¶ 112, *see also* FAC ¶¶ 39-43. The FAC further alleges that Defendant Zimmerman sent an e-mail, subject line "Bill just introduced," attaching a PDF file of proposed Senate Bill 2224. (Exhibit 5.) The proposed bill, in key and relevant part, would have amended Tennessee's civil forfeiture laws to specifically exclude CBD products. *Id.* at ¶ 41. Thus, the FAC clearly alleges facts to support "ill-will" regarding the selective enforcement claim, facts centered upon Defendants' "forbidden aim" of monetary gain. *Gardenhire v. Schubert*, 205 F.3d 303, 319 (6th Cir. 2000) ("selective enforcement is a federal constitutional violation if 'based upon an unjustifiable standard such as race, religion, or other arbitrary classification'. Discrimination is 'purposeful' if it is intended to accomplish some 'forbidden aim' … Such 'forbidden aims' include intentional selective enforcement because of race, nationality, religion, gender or 'other arbitrary classification.'")

Fitzhugh's assertion that business size is not a "constitutionally protected category" is easily dispatched by the Sixth Circuit's opinion in *Stemler v. City of Florence*. 126 F. 3d 856

14

(6th Cir. 1997).  In *Stemler*, the Plaintiff, a lesbian, alleged that the defendant officers chose to arrest and prosecute her for driving under the influence "out of a desire to effectuate an animus against homosexuals."  *Id.* at 873.  Like Defendant Fitzhugh in the present case, the officers in *Stemler* did not attempt to justify their decision, but instead argued that "as a blanket matter it is always constitutional to discriminate on the basis of sexual orientation." *Id.*  (Fitzhugh in essence makes the same argument: it is always constitutional to discriminate on the basis of business size.)   The Court turned to Supreme Court cases expanding the constitutional rights of gays and lesbians, citing *Romer v. Evans*, a landmark case in that area, for the proposition that "if the constitutional conception of equal protection of the laws means anything, it must at the very least mean that a bare desire to harm a politically unpopular group cannot constitute a legitimate governmental interest."  *Id.*, citing *Romer*, 517 U.S. 620, 634 (1996).  Crucially, however, the Sixth Circuit made clear that:

> While this case, and *Romer*, involved animus related to sexual orientation, the principle involved in our case really has nothing to do with that controversial area . . . the principle would be the same if Stemler had been arrested discriminatorily based on her hair color, her college bumper sticker (perhaps supporting an out-of-state rival) or her affiliation with a disfavored sorority or company.

*Id.* at 874.    The Sixth Circuit thus affords constitutional protection against selective enforcement on the basis of "hair color," a "college bumper sticker," or "affiliation with a disfavored … company."  *Id.*  Further to this point, as the Court explained in *Stemler*, the availability of a § 1983 selective enforcement claim "has never been limited only to those groups accorded heightened scrutiny under equal protection jurisprudence.   Instead, a plaintiff makes out a selective-enforcement claim if she shows that the state based its enforcement decision on an 'arbitrary classification.'"  *Stemler*, at 874 (internal citations omitted).  It requires no great logical leap to conclude that the Constitution prohibits selective enforcement of the laws against Plaintiffs because of the size of their businesses and their

15

"perceived lack of resources to defeat the unsupportable claims and criminal charges." FAC

¶ 113.

> The *Stemler* Court also addressed the "rational basis" defense, rejecting it:

>> A selective-enforcement claim such as this one is thus conceptually different from a claim that a statute violates equal protection; while almost every statute can be shown to have some conceivable rational basis, thereby surviving an equal protection challenge unless it is shown to discriminate against a group accorded heightened scrutiny, it will often be difficult to find a rational basis for a truly discriminatory application of a neutral law . . .

>> The defendant officers are unable, and indeed have not even attempted, to demonstrate that there is any conceivable rational basis for a decision to enforce the drunk-driving laws against homosexuals but not against heterosexuals.

*Stemler*, at 874. Defendant Fitzhugh has similarly "not even attempted" to demonstrate that there was "any conceivable rational basis" for enforcing the drug laws—as Defendants misunderstood them—against the Plaintiffs but not against Amazon and Wal-Mart.

Finally, the dodgy contention that Fitzhugh cannot "have liability for the prosecution" because "the decision to prosecute lies solely with the prosecutor" does not withstand even a cursory reading of *Stemler*. Defs.' Mem., at 12. *Stemler* itself allowed the selective enforcement claims of the arresting officers to stand. *Stemler*, at 875. Attempting to narrow the nature of the constitutional violations merely to the single act of the "decision to prosecute" glosses over Plaintiffs claims "to be free from false arrest, unlawful seizure, and unlawful prosecution" alleged in the FAC. FAC, Count I, at 17.

For these reasons, Defendant Fitzhugh's motion to dismiss the selective enforcement claim should be denied.

### 4. Plaintiffs' civil conspiracy claims survive because the Amended Complaint clearly alleges a "single plan" among the Defendants, including Fitzhugh's personal involvement in prosecuting the Plaintiffs despite his awareness that probable cause was wholly lacking.

Fitzhugh argues that Plaintiffs' conspiracy claims fail because the FAC "cannot possibly be construed to assert that a single plan or conspiracy existed." Defs.' Mem. at 15.

16

Fitzhugh insists that the FAC "details disagreements and concerns between the various actors about the Candy Crush operation." *Id.* The problem for Fitzhugh, however, is that the disagreement relevant to him is the one in which he personally ensured that Operation Candy Crush would proceed despite the clear objections of his subordinate, Major Sharp, whom Fitzhugh had effectively overruled. (Fitzhugh also argues that because the TBI disagreed with "the prosecution," there is no conspiracy. *Id.* That assertion is irrelevant: TBI is not a defendant in this case nor is alleged to have participated in any conspiracy. To the contrary, TBI insists that it told "all stakeholders," including Fitzhugh, about the limitations of its laboratory analysis. FAC Exhibit 9, "TBI Smt. Via Email," at 1-2. Major Sharp's memorandum is consistent with and supports TBI's version of events. FAC Exhibit 4, at 1. TBI's prudent decision not to conspire with the Defendants does not disprove the existence of a conspiracy among the Defendants. If anything, TBI's statements support the inference that Defendants were fully aware that probable cause could not be established in any Plaintiff's case.)

### a. § 1983 Conspiracy Claim

The Sixth Circuit defines a §1983 civil conspiracy as "an agreement between two or more persons to injure another by unlawful action." *Hooks v. Hooks*, 771 F.2d 935, 944 (6th Cir. 1985). Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy. *Id.* Each conspirator need not have known all of the details of the illegal plan or all of the participants involved. *Id.* All that must be shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant. *Id.* The Sixth Circuit has also indicated that because "rarely in a conspiracy case will there be direct evidence of an express agreement among all the conspirators to conspire . . . circumstantial evidence may provide adequate proof of conspiracy." *Weberg v. Franks*, 229 F.3d 514, 528 (6th Cir. 2000).

17

The FAC clearly alleges that Defendant Zimmerman was motivated by a pending change in civil forfeiture law and that he conveyed this motive to RCSO Major Sharp in December 2017. FAC ¶¶ 36-43. Zimmerman was fully aware that larger businesses were selling the same CBD hemp products but singled out the Plaintiffs for prosecution based on their perceived lack of resources. *Id.* at 113. Major Sharp "briefed the sheriff [Fitzhugh] . . . on this case" on January 22, 2018. FAC Exhibit 4, at 1. As of January 30, 2018, according to Major Sharp, there was a "consensus, no one is comfortable moving ahead at this time." *Id.* at 2. At a crucial February 2, 2018 meeting attended by Major Sharp and an unidentified RCSO employee, Zimmerman stated: "They will come in on their court date, plead guilty, pay the fines and get their businesses open." "We will put off the court dates, attorneys will get tired of coming to court and settle." *Id.* And at some point in early February, Defendant Fitzhugh met with Defendants Zimmerman and Jones and made the official decision to allow the law enforcement investigation to proceed despite the specifically enumerated concerns of his subordinates. *Id.*

On these facts, the "single plan" that existed was, simply put, a scheme to shake down the Plaintiffs by arresting them, imposing fines upon them, and threatening to close their businesses. Fitzhugh did not need to know "all of the details of the illegal plan or all of the participants involved" in order to participate in the conspiracy. It is enough that he "shared in the general conspiratorial objective" of this plan and took the affirmative step—the "overt act"—of instructing his subordinates to meet with Defendants Zimmerman and Jones and allowing the investigation to proceed.

### b. § 1985(3) Conspiracy Claim.

With respect to Plaintiffs' 42 USC 1985(3) claim, Plaintiffs must show:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities of the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States … The

18

plaintiff must show that the deprivation at issue was caused by "class-based discriminatory animus." A class protected by section 1985(3) must possess the characteristics of a discrete and insular minority, such as race, national origin, or gender.

*Keppler v. Haslam*, 2013 U.S. Dist. LEXIS 54807, *13 (M.D. Tenn., Case No. Case No. 3:11-CV-1040, April 17, 2013). As an initial matter, Plaintiffs concede that the FAC does not clearly allege that Plaintiffs possess the characteristics of a discrete and insular minority, such as race, national origin, or gender and that they were deprived of their rights because of a class-based discriminatory animus. However, Plaintiffs respectfully submit that, if permitted to amend their Complaint, Plaintiffs could in fact make such a showing. Plaintiffs have thus respectfully asked the Court for leave to amend pursuant to Fed. Rule Civ. P 15(a)(2), in the interests of justice, in a contemporaneously filed Motion to Amend with a proposed Second Amended Complaint.

Defendants, however, do not move to dismiss the § 1985 conspiracy claim on the basis that Plaintiffs are not members of a class within the protection of § 1985. Instead, they argue that there was no "single plan" and that there was no violation of a constitutional right. These arguments have been addressed *supra*, and should be rejected.

5. **Plaintiffs' *Monell* claims against Rutherford County survive because Fitzhugh is a final policymaker with authority sufficient to bind the County through his actions.**

Defendants Rutherford County and Fitzhugh (in his official capacity) move to dismiss Plaintiffs' claims against the County and Fitzhugh on the mistaken basis that: "allegations of a single incident of misconduct are not sufficient to infer a municipal wide policy." Defs.' Mem. at 16-17, citing *Thomas v. City of Chattanooga,* 398 F.3d 426, (6th Cir. 2005). This assertion, lifted from the inapposite case of *Thomas v. City v. Chattanooga*, misconstrues the applicable law of municipal liability as decided by the United States Supreme Court in *Pembaur v. City of Cincinnati*. 475 U.S. 469 (1985). Even *Thomas*, upon which Defendants rely, cited *Pembaur* for the proposition that:

19

> There are at least four avenues a plaintiff may take to prove the existence of a municipality's illegal policy or custom. The plaintiff can look to (1) the municipality's legislative enactments or official agency policies; (2) **actions taken by officials with final decision-making authority**; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations.

*Thomas* at 429, citing *Pembaur* at 480) (emphasis added.)  *Thomas* involved the fourth theory—a theory of "tolerance" of allegedly unconstitutional actions centered upon the use of excessive force by an individual police officer.  *Id.*  It did not, as does the present case, concern the second theory—that an individual with "final decision-making authority" (Fitzhugh) took an unconstitutional action representing the policy of the municipality (Rutherford County).  The language Defendants excerpt from *Thomas* is true enough, as applied to an individual police officer in a "tolerance" theory case—but it has no meaningful relevance to this case, which concerns the unconstitutional actions taken by Fitzhugh, a county official with final decision-making authority.

### a.  Fitzhugh is a final policy-maker for Rutherford County under Tennessee law.

With respect to Fitzhugh's status as a policy-maker under *Monell v. New York Department of Social Services* (436 U.S. 658) (1978), the Tennessee Supreme Court specifically addressed the status of sheriffs under Tennessee law in *Spurlock v. Sumner County*. 42 S.W.3d 75 (Tenn. 2001.)  In *Spurlock*, the Tennessee Supreme Court answered the following certified question from the Middle District of Tennessee (Judge Robert L. Echols): "Does a sheriff, when acting in a law enforcement capacity, [act] as a state [official] or [as a] county official under Tennessee law?"  *Id.* at 76.  Sumner County had argued that the Sumner County Sheriff "did not speak with final policymaking authority for the county because Tennessee law provides that sheriffs are state, not county, officers."  *Id.* at 77.  Rejecting this assertion, the Court described a sheriff as "the commander in chief of the law forces of the county."  *Id.* at 79, citing *State ex. rel. Thompson v. Reichman*, 188 S.W. 225 (Tenn. 1916).   The Court conducted a "thorough review of applicable authority" and

20

answered the certified question in the affirmative, holding that a sheriff acting in a law enforcement capacity serves as a county official under Tennessee law.  *Id.* at 77.

### b. A single decision by a final decision-maker such as Fitzhugh can impose municipal liability on a County such as Rutherford.

Returning to *Pembaur v. City of Cincinnati* underscores the significance of *Spurlock v. Sumner County* to the present case.  In *Pembaur*, the Supreme Court considered "whether, and in what circumstances, a decision by municipal policymakers *on a single occasion*" could state a claim for municipal liability under *Monell*.  *Pembaur,* at 471 (emphasis added). The Supreme Court answered this question in the affirmative, reasoning:

> It is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances . . .

> No one has ever doubted, for instance, that a municipality may be liable under § 1983 for a single decision by its properly constituted legislative body -- whether or not that body had taken similar action in the past or intended to do so in the future -- because even a single decision by such a body unquestionably constitutes an act of official government policy. . .

> *Monell's* language makes clear that it expressly envisioned other officials "whose acts or edicts may fairly be said to represent official policy," and whose decisions therefore may give rise to municipal liability under § 1983.

*Id.* at 480, internal citations omitted.  The Court then announced its holding:

> We hold that municipal liability under § 1983 attaches where -- and only where -- a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.

*Id.* at 483.  In passing, the *Pembaur* Court noted that "whether an official had final policymaking authority is a question of state law."  *Id.*  *Pembaur* thus created the necessity for the Tennessee Supreme Court's opinion in *Spurlock* to decide whether a sheriff acting in a law enforcement capacity is a county official under Tennessee law.  Because the Court's decision in *Spurlock* clarified that "a sheriff, when acting in a law enforcement capacity, acts as a county official under Tennessee law" (*Spurlock*, at 82), a single decision by Sheriff

21

Fitzhugh may establish an official policy and impose municipal liability upon Rutherford County.

### c. Fitzhugh made a "single decision" to allow Operation Candy Crush to proceed and thus created the "official policy" of Rutherford County with respect to the violations of Plaintiffs' constitutional rights.

The underlying facts of *Pembaur* illuminate the contours of a "single decision" claim for municipal liability and support a finding of such liability in present case. Bertold Pembaur was a medical doctor in Cincinnati, Ohio, (Hamilton County) whose practice served mostly welfare patients relying on government assistance to pay for medical care. *Pembaur*, at 471. Pembaur was indicted for fraudulently accepting payments from state agencies for services he had not actually provided. *Id.* As part of the investigation, the grand jury issued subpoenas for the appearance of two of Pembaur's employees. *Id.* at 472. When these witnesses failed to appear, Assistant Prosecutor William Whalen obtained capiases for their arrest and detention. *Id.*

Two deputies from the Hamilton County Sheriff's Office attempted to serve these capiases at Pembaur's clinic. Pembaur wedged a piece of wood between the door and the wall and refused them entry. *Id.* The sheriffs decided to take no further action until the Cincinnati Police arrived. *Id.* After the police arrived and Pembaur still refused to allow the officers to enter, the sheriffs decided to call their supervisor for instructions. Their supervisor told them to call Assistant Prosecutor Whalen and to follow his instructions. *Id.* at 473. The Deputy Sheriffs then telephoned Whalen and informed him of the situation. Whalen conferred with County Prosecutor Leis, who told Whalen to instruct the Deputy Sheriffs to "go in and get [the witnesses]." *Id.* Whalen in turn passed these instructions along to the Deputy Sheriffs. *Id.* After a final attempt to persuade Pembaur voluntarily to allow them to enter, the Deputy Sheriffs tried unsuccessfully to force the door. *Id.* City police officers, who had been advised of the County Prosecutor's instructions to "go in and get" the witnesses, obtained an axe and chopped down the door. *Id.* The Deputy Sheriffs then

22

entered and searched the clinic. *Id.* Two individuals who fit descriptions of the witnesses sought were detained but turned out not to be the right persons. *Id.*

Pembaur filed suit under 42 USC § 1983 against Hamilton County and the Hamilton County Sheriff, among others. *Id.* at 474. The District Court dismissed the claim against the County and the Sixth Circuit upheld the dismissal. The Sixth Circuit reasoned that, while Pembaur had claimed that "the deputy sheriffs acted pursuant to the policies of the Sheriff and Prosecutor by forcing entry into the medical center," he did not point to anything else beyond that "one occasion." *Id.* at 476. The Sixth Circuit held: "that single, discrete decision is insufficient, by itself, to establish that the Prosecutor, the Sheriff, or both were implementing a governmental policy." *Id.* at 477.

The Supreme Court granted certiorari and reversed. As mentioned above, the Court held that a single decision by a final policy-maker could impose municipal liability where a "deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Id.* at 483. In applying that standard to the facts of *Pembaur*, the Court concluded that the Prosecutor's clear command to the Deputy Sheriffs to "go in and get [them]" created the official policy of Hamilton County. *Id.* at 484. In reaching this conclusion, the Court pointed to the role of the Hamilton County Sheriff:

> Pursuant to standard office procedure, the Sheriff's Office referred this matter to the Prosecutor and then followed his instructions. The Sheriff testified that his Department followed this practice under appropriate circumstances and that it was "the proper thing to do" in this case.

*Id.* at 485. Justice Powell, in dissent, succinctly summarized the Court's holding: "[The Prosecutor's] five-word response to a single question over the phone is now found by this Court to have created an official county policy for which Hamilton County is liable under § 1983." *Id.* at 492, (Powell, J., dissenting.)

Unlike Fitzhugh, the Hamilton County Sheriff had no direct involvement in the decision to refer the Deputy Sheriffs to the Prosecutor for direction. Nevertheless, the Supreme Court found that municipal liability could be imposed upon the county because the Prosecutor had "acted as the final decisionmaker for the county." *Id.* at 485.

In that respect, the case at bar presents a much clearer case for municipal liability than *Pembaur* itself. Fitzhugh's decision to convene a meeting with Prosecutors and to allow Operation Candy Crush to proceed was unquestionably a decision by a county official with final decision-making authority (*see Spurlock v. Sumner County, supra*). Fitzhugh made the decision to "follow the course of action" of arresting the Plaintiffs and padlocking their businesses "from among various alternatives." *Pembaur*, at 483. One RCSO Officer thought it "extreme to padlock/arrest." FAC Exhibit 2, "Interview Notes," p. 3. Major Sharp recorded that he "did not agree with going forward" and "spoke about slowing the investigation down, letting the owners know their product may be illegal." FAC Exhibit 4, at 2. Fitzhugh decided against these available alternative courses of action. That decision directly led to the execution of Operation Candy Crush and caused the violation of Plaintiffs' constitutional rights.

On this factual record, the actions of Fitzhugh, as a final policy-maker for the county, are sufficient to give rise to a claim of municipal liability against Rutherford County.

## CONCLUSION

Plaintiffs have stated claims for violations of their constitutional rights guaranteed under the Fourth and Fourteenth Amendments. Neither absolute nor qualified immunity shields Defendant Fitzhugh from his unreasonable actions in ensuring the unlawful arrests of the Plaintiffs and the "extreme" padlocking of their businesses. Similarly, Rutherford County cannot escape liability for the actions of Fitzhugh, a final decision-maker, whose deliberate choices bind Rutherford County. Plaintiffs respectfully request leave to amend to cure any defects in their civil conspiracy claims, as Plaintiffs have a good faith basis to allege

24

facts sufficient to establish that Plaintiffs faced discrimination on the basis of their national origin.

For these reasons, Defendants' motion should be denied.

Respectfully submitted,

DAVID RANDOLPH SMITH & ASSOCIATES

By: /s/ Christopher W. Smith
Christopher W. Smith, TN BPR #034450
David Randolph Smith, TN BPR #011905
Dominick R. Smith. TN BPR #028783
W. Lyon Chadwick. Jr. TN BPR #029599
1913 21st Avenue South
Nashville, Tennessee 37212
615-742-1775
csmith@drslawfirm.com
drs@drslawfirm.com
dom@drslawfirm.com
lyon@drslawfirm.com

/s/ Wesley Clark
Wesley Clark, #32611
Frank Brazil, #34586
Brazil Clark, PLLC
2706 Larmon Avenue
Nashville, TN 37204
*Attorney for Plaintiff Rieves*

25

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document was sent via the Court's electronic filing system to all counsel registered in this case on December 20, 2018.

Frank R. Brazil
Wesley B. Clark Brazil Clark, PLLC 2706
Larmon Avenue
Nashville, TN 37204

Nathan D. Cate
Jesse P. Lords
Law Offices of Lords and Cate Washington Square Building
222 2nd Ave. N., Ste. 415 Nashville, TN 37201
*Attorneys for Plaintiff Rieves*

Robert M. Burns
Austin C. Evans
Howell & Fisher, PLLC
Court Square Building
300 James Robertson Parkway #300 Nashville, TN 37201
*Attorney for Town of Smyrna and Kevin Arnold*

Heather Cairns Ross
Tennessee Attorney General's Office PO Box 20207
Nashville, TN 37202
*Attorney for Jennings Jones*

William T. Ramsey
Blind Akrawi
1201 Demonbreun Street, Suite 1000 Nashville, Tennessee 37203
(615) 244-1713 – Telephone
(615) 726-0573 – Facsimile
*Attorneys for John Zimmermann*

/s/ Christopher W. Smith

26