IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

| JAMES SWAIN RIEVES, ET AL. | ) | |
|---|---|---|
| | ) | CASE NO. 3:18-CV-0965 |
| PLAINTIFFS, | ) | |
| | ) | Judge Aleta A. Trauger |
| V. | ) | |
| | ) | Jury Trial Demanded |
| TOWN OF SMYRNA, TENNESSEE, ET. AL. | ) | |
| | ) | |
| | ) | |
| DEFENDANTS. | ) | |

**PLAINTIFFS' RESPONSE TO DEFENDANT JOHN ZIMMERMAN'S MOTION TO DISMISS**

Plaintiffs submit that Defendant John Zimmerman's motion to dismiss should be denied because Defendant Zimmerman ("Zimmerman") is not entitled to absolute immunity for giving legal advice to law enforcement officers during the investigative phase of Operation Candy Crush. Nor is Zimmerman entitled to qualified immunity for his unreasonable and malicious actions in directing the investigation that led to the wrongful arrests and prosecutions of the Plaintiffs.[1] Finally, Plaintiffs have clearly alleged viable constitutional injuries such that their conspiracy claims survive.

---

[1] Plaintiffs have filed a Proposed Second Amended Complaint (D.E. 37-1), which includes allegations supporting a finding of "malicious intention" on the basis of Plaintiffs' national origin. (D.E. 37-1, ¶¶ 85-91, 125-128.) This Response is limited to the allegations included in the First Amended Complaint (D.E. 5).

# FACTUAL BACKGROUND

As concerns Zimmerman, the First Amended Complaint ("FAC") alleges the following significant facts:

Plaintiffs are owners of convenience stores, tobacco stores, and "vape shops" that sell a variety of tobacco products. FAC at ¶ 26. In addition to tobacco, Plaintiffs sold products containing industrial hemp-derived cannabidiol ("CBD") which is legal under Tennessee and federal law. *Id.* at ¶ 27. In or around February 2017, the Rutherford County Sheriff's Office ("RCSO") began investigating the sale of CBD products. *Id.* at ¶¶ 28-31. As part of the investigation, RCSO Officers purchased these products from Plaintiffs' stores and submitted them for testing by the Tennessee Bureau of Investigation ("TBI"). *Id.* RCSO Officers then contacted Defendant John Zimmerman, an Assistant District Attorney in Rutherford County, to "seek prosecutorial direction on the case." *Id.* at ¶ 32.

According to interview notes obtained from Rutherford County, the "direction" that Zimmerman gave to the RCSO Officers was to make more purchases of CBD products, including outside the city of Murfreesboro. *Id.* at ¶ 33 (*see also*, FAC, Exhibit 2 ("Interview Notes")). During this conversation with Zimmerman, a RCSO Officer "brought up to [Zimmerman] Amazon is selling [the same products]. [Zimmerman] laughed and said we aren't going after Amazon. He said go to vape stores." *Id.* at ¶ 34. RCSO Officers adopted this plan and executed it: they went to vape stores and did not investigate Amazon, a major online retailer. *Id.* at ¶¶ 50-53. Exhibit 2 to the FAC, "Interview Notes" prepared by Rutherford County, records that one officer: "sought legal advice from prosecution. Spoke to J. Zimm. [a number of] times for clarity. Couldn't get clarity from J. Zimm." *Id.* at ¶ 37, FAC Exhibit 2, p. 2. Thus Zimmerman both provided legal advice to the officers and actively directed the investigation. FAC at ¶ 35.

2

On December 17, 2017, Zimmerman sent an e-mail with the subject "lab reports" to various TBI employees. *Id.* at ¶ 37. In the email, Zimmerman wrote:

> Before we indict these owners of businesses, and padlock their businesses, we want to make sure we are understanding what is being offered for sale. Police say we have about 20 businesses and I want to make sure we are on the same page as the expert chemists.

*Id.* (*See also* FAC Exhibit 3, "Email Re Concern TBI.") Based on the above email, as of December 17, 2017, Zimmerman knew that the TBI lab reports were not conclusive as to the legality or illegality of the products sold by Plaintiffs. *Id.* at ¶ 38. According to a March 26, 2018 memo, titled "Narcotics Investigation of CBD oils", by Major William E. Sharp of the Rutherford County Sheriff's Office, Zimmerman wanted the law enforcement operation to be completed before a potential change in Tennessee law:

> Early part of December 2017, I received a call from ADA John Zimmerman concerning investigation of synthetics, Gummy Bears and Marijuana Oils being sold in various stores throughout Rutherford County. Zimmerman asked me to "Get Detective [Redacted] more involved, a lot needed to be done." Zimmerman said: "they wanted to take this case to the February Grand Jury." Zimmerman explained we needed to move quickly and have this done before (*something about legislation*).

*Id.* at ¶ 39 (emphasis added) (*see also* FAC Exhibit 4, "Memo of Major Sharp"). Exhibit 5 to the FAC is an email sent by Zimmerman, subject line "Bill just introduced," attaching a PDF file of proposed Senate Bill 2224. *Id.* at ¶ 41. The proposed bill, in key and relevant part, would have amended Tennessee's civil forfeiture laws to specifically exclude CBD products. *Id.* The bill was first filed for introduction on January 31, 2018, approximately two weeks before Operation Candy Crush was executed and Plaintiffs were criminally charged. *Id.* at ¶ 42. Major Sharp's memo describes the crucial role that civil forfeiture played in the Candy Crush operation, recording that Zimmerman stated: "They [Plaintiffs] will come in on their court date, plead guilty, pay the fines and get their businesses open." "We will put off the court dates, attorneys will get tired of coming to court and settle." *Id.* at ¶ 43.

3

On February 12, 2018, when Operation Candy Crush was executed, the leading law enforcement officers, including Sheriff Fitzhugh, staged a televised press conference (the "Press Conference") in front of the Vapesboro store, owned by Plaintiffs Scott and Gina Ritter. FAC at ¶ 52. At this Press Conference, Defendant Kevin Arnold defended the actions of the law enforcement agencies by stating: "every one of these stores, the Judge approved the lock down." *Id.* at ¶ 65. In fact, Judge Royce Taylor approved the nuisance petitions on the basis of false affidavits submitted by Det. Beane, a RCSO Officer. *Id.* at ¶¶ 66-83. These affidavits were false in that they alleged the CBD products contained "marijuana extracts," when in fact they did not. *Id.* at ¶¶ 68-69. The affidavits alleged the products had been sold to children, which was false. *Id.* The affidavits alleged that the TBI "determined the candy had been laced with 'CBD,'" when, in fact, the TBI had never purported to make any claim regarding "lacing" products with CBD. *Id.* at ¶¶ 71-72. And in at least one case (Plaintiff Louis Shaun Berbert), the affidavit submitted by Det. Beane included a lab report that had been revised to specifically remove drug scheduling. *Id.* at ¶¶ 73-78. Det. Beane, along with Defendants Zimmerman and Jones, did not advise the Court that the report had subsequently been amended to remove the very scheduling on which they were now relying for their nuisance petition. *Id.*

With respect to the grand jury indictments referenced obliquely in Exhibit 1 to the FAC ("A couple of meetings transpired within weeks leading to the Grand Jury indictment,") Defendant Jennings Jones' Press Release (Exhibit 8 to the FAC), elaborates more fully on how these indictments were obtained:

> After all the TBI lab reports were received in this investigation, the information concerning the investigation coupled with the findings of the TBI lab were presented to the Rutherford County Grand Jury and then to Circuit Judge Royce Taylor. These TBI lab reports were filed with the court by my office and constitute public records. *The Grand Jury returned true bills because the TBI lab reports stated that the substances within the edible products contained illegal controlled substances.* The TBI lab reports and reports of the investigations were also presented to Judge Taylor as part of a petition to

4
Case 3:18-cv-00965   Document 41   Filed 01/02/19   Page 4 of 18 PageID #: 294

> declare these businesses as public nuisances under the law. State law declares that any building used in the selling of controlled substances constitutes a public nuisance. *Judge Taylor found probable cause that each business was operating as a public nuisance based, in part, upon the findings contained in the TBI lab reports that the products contained a Schedule VI controlled substance.* Judge Taylor then ordered law enforcement agencies to padlock each business pending a hearing in court . . .
>
> Since the TBI lab cannot conclusively establish in court that the cannabidiol they detected was derived from a marijuana plant, the State cannot prove the substance is actually a Schedule VI controlled substance. *The TBI lab reports constituted the foundation of all indictments and nuisance actions in this case.*

FAC Exhibit 8, at 1-2 (emphasis added). The Press Release suggests that the information presented to the grand jury was substantially similar, if not identical, to the information presented to Judge Taylor as part of the nuisance petition. Jones states that the TBI lab reports and "information concerning the investigation . . . were presented to the Rutherford County Grand Jury *and then to Circuit Judge Royce Taylor.*" *Id.* (Emphasis added.) Jones acknowledges that the criminal charges could not be sustained because "the TBI lab reports constituted the foundation of all indictments and nuisance actions in this case."

For its part, the TBI forcefully rejected Jones' contention that the TBI had "assured" his office that the CBD products at issue were "illegal controlled substances." FAC at ¶ 84. The TBI released a statement that read, in relevant part:

> It is inaccurate for the local stakeholders in these cases to assert they made decisions in this case unaware of the limits of our forensic work . . .
>
> We clearly explained—in detail—the limitations of our analysis to all stakeholders. We did so to ensure they fully knew that, though we could identify CBD, we were not able to identify its origin . . .
>
> We also explained to them the nuance of the included schedule on our lab reports, which are provided as a courtesy. In this instance, we listed the schedule out of an abundance of caution because the sample could have met the standard for schedule as spelled out in the law. Local agencies and prosecutors — including those in Rutherford County — are well aware of that nuance.

5

FAC Exhibit 9, "TBI Stmt. Via Email," at 1-2.  TBI thus insisted that it had specifically informed Zimmerman and Jones of the "the limitations of our analysis" *before* the grand jury indictments and nuisance petitions were obtained.

The TBI's statement is consistent with Major Sharp's memo, which records that on January 12, 2018, Major Sharp was informed that "TBI does not feel comfortable testifying about the items being legal [*sic*]."  FAC Exhibit 4, at 1. At that time, Major Sharp instructed other RCSO Officers "not to make any further buys and to stop any further investigation until I can get some answers." *Id.*  On January 22, 2018, Major Sharp "briefed the sheriff [Defendant Fitzhugh] and [RCSO] Chief Grissom on this case. I advised the Chief I was not comfortable proceeding until I have further information." *Id.*  On January 24, 2018, Major Sharp spoke with Defendant Jennings Jones, who "became upset about the T.B.I. and the testing." *Id.*  As of January 30, 2018, according to Major Sharp, there was a "Consensus, no one is comfortable moving ahead at this time." *Id.* at 2. The next day, January 31, 2018, Major Sharp told Chief Grissom "I still have concerns with Narc case. I told him I'm leaning towards putting it off." *Id.*  The day after that, February 1, 2018, Major Sharp met with Defendant Jones and detailed his specific concerns regarding the investigation.  Among these were: "Legal or not . . . The owners lack of knowledge of it being illegal . . . Law suites [*sic*] . . . slowing the investigation down, letting the owners know their product may be illegal." *Id.*

At this point, "unsatisfied with Major Sharp's decision, the District Attorney's Office reached out to the highest level of command at the Sheriff's Office"—that is, Defendants Zimmerman and Jones went above Major Sharp and contacted Defendant Sheriff Fitzhugh directly.  FAC Exhibit 1, "RCSO Investigative Report," at 4.  Sheriff Fitzhugh "allowed for the District Attorney's Office to set up another meeting with Major Sharp and multiple narcotics detectives."  *Id.*  Shortly thereafter, Operation Candy Crush was executed.  FAC at ¶ 50.

6

# ARGUMENT

1. **Zimmerman is not entitled to absolute immunity for his investigative acts, including providing legal advice and directing the actions of law enforcement officers.**

Zimmerman's argument for absolute immunity relies on outdated Sixth Circuit case law and completely ignores the United States Supreme Court decision in *Burns v. Reed*, which squarely governs the legal issue of prosecutorial immunity for investigative acts. 500 U.S. 478 (1991). In *Burns*, the Supreme Court held that "advising the police in the investigative phase of a criminal case is [not] so 'intimately associated with the judicial phase of the criminal process' that it qualifies for absolute immunity." *Id.* at 493. The Court explained that "it is incongruous to allow prosecutors to be absolutely immune from liability for giving advice to the police, but to allow police officers only qualified immunity for following the advice." *Id.* at 495. The central purpose of absolute prosecutorial immunity, the Court reasoned, is "to free the judicial process from the harassment and intimidation associated with litigation." *Id.* at 494. But that concern "justifies absolute prosecutorial immunity only for actions that are connected with the prosecutor's role in judicial proceedings, not for every litigation-inducing conduct." *Id.*

Reviewing the underlying facts of *Burns* clarifies the distinction drawn by the Court and highlights *Burns'* application to the present case. On the evening of September 2, 1982, Cathy Burns called the Muncie, Indiana, police and reported that an unknown assailant had entered her house, knocked her unconscious, and shot her two sons while they slept. *Id.* at 481. The investigating police officers came to view Ms. Burns as the primary suspect, even though she had passed a polygraph test. *Id.* at 482. Despite this and other exculpatory evidence, the officers speculated that Ms. Burns had multiple personalities. *Id.* To confirm this theory, the officers decided to interview Ms. Burns under hypnosis. *Id.* The officers were concerned, however, that "hypnosis might be an unacceptable investigative technique." *Id.* In need of clarity on this question, the officers sought the advice of the Chief Deputy Prosecutor. *Id.* In response, the

Prosecutor told the officers that they could proceed with the hypnosis. *Id.* Under hypnosis, Ms. Burns referred to the assailant as "Katie," which the officers interpreted as confirming their multiple-personality theory. *Id.* The officers then informed the Prosecutor about these statements, to which the Prosecutor advised that the officers "probably had probable cause" to arrest Ms. Burns. *Id.* With this assurance, the officers arrested Ms. Burns. *Id.*

The next day, at a probable-cause hearing, the officers offered the misleading testimony that Ms. Burns had "confessed to shooting her children." *Id.* Neither officer acknowledged that the "confession" was obtained under hypnosis or that Ms. Burns had repeatedly denied shooting her sons. *Id.* at 483. On the basis of this misleading presentation, the judge issued a search warrant. *Id.* Ms. Burns was charged with attempted murder of her children; but after the trial judge suppressed the statements given under hypnosis, the charges were dropped. *Id.*

Ms. Burns filed suit under § 1983 against the Prosecutor, the officers, and others. *Id.* The District Court for the Southern District of Indiana granted the Prosecutor a direct verdict, ruling that he was absolutely immune from liability for his conduct in giving legal advice to the police. *Id.* The Seventh Circuit affirmed. *Id.* The Supreme Court granted certiorari to resolve a circuit split on the issue of whether a prosecutor enjoys absolute immunity for legal advice given to the police. *Id.* at 483, n. 2 ("the courts are split on the issue of whether absolute immunity extends to the act of giving legal advice to the police"). The Court concluded that, while the Prosecutor was entitled to absolute immunity for his participation in the search warrant hearing, he was not entitled to such immunity for his role in advising the officers. *Id.* at 492-493. The Court observed that neither the lower courts nor the Prosecutor "identified any historical or common-law support for extending absolute immunity to such actions [giving legal advice] by prosecutors." *Id.* at 492.

Application of *Burns* to the present case is straightforward. The FAC clearly alleges that Zimmerman gave the investigating officers (incorrect) legal advice concerning the criminality of

the products in Plaintiffs' stores. FAC at ¶¶ 32-36. Zimmerman directed the investigation of the officers, telling them which stores to inspect and which stores, like Amazon and Wal-Mart, to avoid. *Id.* at ¶¶ 33-34. The officers in the present case, like their counterparts in *Burns*, sought clarity on the law from Zimmerman, who attempted to provide it. Zimmerman impressed upon these officers the need to "move quickly" because of pending legislation that could prevent a financial recovery (through civil forfeiture laws) for the Defendants. *Id.* at ¶¶ 39-43. When Major Sharp voiced his concerns about proceeding with Operation Candy Crush, Zimmerman explicitly advised that the Plaintiffs had broken the law. FAC Exhibit 4, at 2. Zimmerman and Defendant Jones went above Major Sharp, reaching out to Sharp's superior, Defendant Fitzhugh, to be given a chance to convince Sharp and the other investigating officers that the Plaintiffs had committed crimes. *Id.* at ¶ 50, FAC Exhibit 4, p. 2. All of these actions occurred during the investigative phase, before any judicial proceedings had been initiated.

At a minimum, on these facts, Zimmerman has not met his burden of establishing that he is entitled to absolute immunity and that these actions occurred in an advocacy role. *Burns,* at 486 ("the official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question"). In *Prince v. Hicks*, the Sixth Circuit, citing the United States Supreme Court's decision in *Buckley v. Fitzsimmons*, explained that a "prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity." 198 F.3d 607, 611 (6th Cir. 1999) (citing *Buckley*, 509 U.S. 259, 273). Further, a prosecutor who "performs the investigative functions normally performed by a detective or police officer" such as "searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested" is entitled at most to only qualified immunity. *Id.* Zimmerman's actions fall squarely within this rule. He "searched for clues" that could potentially

support probable cause by directing law enforcement officers to "go to vape shops" to purchase more CBD products for laboratory testing. FAC at ¶ 34. Absolute immunity does not shield Zimmerman from liability for these investigative functions.

*Prince* helpfully clarifies that *Grant v. Hollenbach* (870 F.2d 1135, 6th Cir. 1989), upon which Zimmerman relies, was effectively overruled by the Supreme Court decisions in *Buckley* and *Burns*. Zimmerman attempts to resurrect the dead letter of *Grant* for the anemic distinction that a prosecutor's decision whether to investigate a serious criminal charge is entitled to absolute immunity, while a prosecutor's participation in an "actual investigation" is not. *Id.* at 1138-39, *see also* Def.'s Mem. at 7. As an initial matter, it's unclear how the *Grant* distinction, even if still good law, would avail Zimmerman. The FAC clearly alleges that Zimmerman participated in, even directed, an "actual investigation" which is alleged to have violated Plaintiffs' constitutional rights. But even setting that objection aside, the distinction drawn by *Grant* did not survive *Burns* or *Buckley*, as the Sixth Circuit explicitly recognized in *Prince*:

> The plaintiff in *Grant* had been indicted on sexual abuse charges, but the charges were later dismissed. One of the allegations in the plaintiff's complaint stated that the prosecutors "failed to conduct an objective and impartial investigation as to the charge, and the credibility and competency of the accusers" . . . The court noted that "this is not a case in which the prosecutor allegedly violated plaintiff's or another's constitutional rights through actual investigation" and concluded that the complaint was properly dismissed on absolute immunity grounds because "the decision of the prosecutors to investigate a serious criminal charge [as opposed to an actual investigation] is protected by absolute immunity."
>
> The allegations in *Grant*, however, are not analogous to the allegations made in the present case because Prince has alleged that Hicks violated her constitutional rights when she "undertook to perform an investigation" . . .
>
> Furthermore, we do not believe that the court's distinction in *Grant* between a prosecutor who simply decides whether to initiate an investigation and a prosecutor who actually participates in an investigation holds up after the Supreme Court's decisions in *Burns* and *Buckley*. In *Buckley*, the Supreme Court explained that a prosecutor who performs functions typically undertaken by a police officer or detective, e.g., actively gathering evidence or deciding whether to follow up on an investigative lead, is not entitled to absolute

10

immunity if the prosecutor performs these functions outside his actions as an advocate for the state.

*Prince*, at 612. The Sixth Circuit thus discarded *Grant*'s analysis, emphasizing that a prosecutor who, like Zimmerman, "actively gather[s] evidence or decide[s] whether to follow up on an investigative lead" is not entitled to absolute immunity.

**2. Zimmerman is not entitled to qualified immunity because:**

**a. The grand jury indictments were based on false information such that any presumption of probable cause is inconclusive and rebuttable;**

**b. Zimmerman's actions were clearly unreasonable, as TBI specifically informed him that they could not establish the CBD products were illegal; and**

**c. Zimmerman's actions were malicious in that they were improperly motivated by financial gain.**

Assessing a claim of qualified immunity requires a "two-tiered inquiry." *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013). The first step is to determine if the facts alleged make out a violation of a constitutional right. *Id*. The second is to ask if the right at issue was "clearly established" when the event occurred such that a reasonable officer would have known that his conduct violated it. *Id.* As this Court has explained, "qualified immunity does not apply where the defendant is alleged to have committed a constitutional violation and the right that was violated was a clearly established right of which any reasonable person in the defendant's position would have known." *Stockdale v. Helper*, 2017 U.S. Dist. LEXIS 90678, *13-14 (M.D. Tenn.) (June 13, 2017). Further, "an official is not protected from suit on the basis of qualified immunity where the allegations support a finding that he or she acted with 'malicious intention to cause a deprivation of constitutional rights or other injury.'" *Id.,* citing *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982).

11

### a. The grand jury indictments were based on false information such that any presumption of probable cause is inconclusive and rebuttable.

Zimmerman echoes Defendants Sheriff Fitzhugh and Rutherford County, whose previously-filed Memorandum (D.E. 23) similarly argued that the grand jury indictments in this case conclusively establish probable cause, defeating Plaintiffs' constitutional claims. Def.'s Mem. at 10. Plaintiffs addressed that argument in their Response (D.E. 36), key portions of which are reproduced here.

In *King v. Harwood*, the Sixth Circuit held:

> Where (1) a law-enforcement officer, in the course of setting a prosecution in motion, either knowingly or recklessly makes false statements (such as in affidavits or investigative reports) or falsifies or fabricates evidence; (2) the false statements and evidence, together with any concomitant misleading omissions, are material to the ultimate prosecution of the plaintiff; and (3) the false statements, evidence, and omissions do not consist solely of grand-jury testimony or preparation for that testimony (where preparation has a meaning broad enough to encompass conspiring to commit perjury before the grand jury), the presumption that the grand-jury indictment is evidence of probable cause is rebuttable and not conclusive.

852 F.3d 568, 587-588 (6th Cir. 2017). The FAC clearly alleges facts fitting squarely within this rule. The affidavit of RCSO Det. Beane, either knowingly or recklessly, falsely claimed that: the Plaintiffs had sold CBD to children; the CBD products contained "marijuana extracts;" and the TBI "determined the candy had been laced with 'CBD.'" FAC at ¶¶ 66-78. And in the case of Plaintiff Louis Shaun Berbert, the affidavit submitted by Det. Beane included a lab report that had been revised to specifically remove drug scheduling. *Id.* at ¶¶ 73-78. Det. Beane, along with Defendants Zimmerman and Jones, did not advise the Court that the report had subsequently been amended to remove the very scheduling on which they were now relying for their nuisance petition and related indictment. *Id.* Charitably understood, these actions were "misleading omissions" that were "material to the ultimate prosecution of the plaintiff." *King* at 587. Under the rule in *King*, Zimmerman cannot rely on the false affidavit of Beane under the circumstances of this case. *King*,

at 588 ("If the proceeding [finding probable cause] is tainted—as here, by fabricated evidence—... the result is that probable cause is lacking"), citing *Manuel v. City of Joliet*, 137 S. Ct. 911, 920 (U.S. 2017).

Zimmerman's fixation on grand jury indictments and the question of probable cause also overlooks Plaintiffs' selective enforcement claims under § 1983 for violation of their right to equal protection of the laws under the Fourteenth Amendment. FAC ¶¶ 109-115. Zimmerman wrongly asserts that: "because probable cause exists, there can be no showing of Fourth or Fourteenth Amendment violations subjecting Defendant Zimmermann to individual liability." Def.'s Mem. at 10. This assertion misperceives the nature of Plaintiff's selective enforcement claims under the Fourteenth Amendment. As the Sixth Circuit explained in *Stemler v. City of Florence*:

> The determination of probable cause does not preclude a plaintiff from pursuing a claim that the state chose to prosecute her due to invidious discrimination. *The courts have long held that a selective enforcement claim may be available even where there is probable cause for prosecution.* While we have held that the possibility of a discriminatory motive does not affect the inquiry into the objective reasonableness of an arrest for the purposes of the Fourth Amendment, *see United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993) (*en banc*), *that case did nothing to question the long-established availability of a separate selective enforcement claim under the Equal Protection Clause.*

126 F.3d 856, 872-873 (6th Cir. 1997) (emphasis added). Even if the grand jury indictments were not rebuttable, as of course they are; and even if there were no doubt that Plaintiffs were validly arrested based on legitimate probable cause, which they were not; Plaintiffs would still have alleged facts stating a claim for a constitutional violation under the Fourteenth Amendment. The result is that Plaintiffs have met their burden of establishing that Zimmerman is not entitled to qualified immunity with respect to the constitutional-violation prong of that inquiry.

### b. Zimmerman's actions were clearly unreasonable, as TBI specifically informed him that they could not establish the CBD products were illegal.

The FAC alleges facts sufficient to establish that a reasonable officer would have known that the Plaintiffs in this case had committed no crime—in fact, the FAC specifically names or

13

alludes to such reasonable officers—to wit, Major Sharp and the other (names redacted) officers who reached the "consensus, no one is comfortable moving ahead at this time" based on several factors, including the TBI's refusal to support the case. FAC Exhibit 4, at 2. Zimmerman's own Memorandum (D.E. 35) openly concedes that Zimmerman "was aware only that the TBI could not test the percentage of THC due to technological constraints" and that the "TBI was unable to provide more information either way due to their technological constraints." Def.'s Mem. at 10-11. Since the amount of THC in the products was a determinative, threshold question[2], these concessions amount to admissions that Zimmerman was aware that probable cause did not exist. As Defendant Jones stated in his Press Release, because "the TBI lab [could not] conclusively establish in court that the cannabidiol they detected was derived from a marijuana plant, the State [could not] prove the substance is actually a Schedule VI controlled substance." Now Zimmerman, by his own admission, acknowledges that he was aware that he could not prove his criminal case even before he brought it.

With respect to Zimmerman's allegation that one of the Plaintiffs sold a product containing an illegal marijuana *synthetic* allegedly "linked to two deaths"[3] (Def.'s Mem. at 10), his own email correspondence to the TBI establishes that the store in question *ceased to do so* well before Operation Candy Crush was executed. FAC at ¶ 37 ("After this seizure the stores switched to

---

[2]  Recall that, under Tennessee law, the distinction between illegal marijuana and legal industrial hemp rests in part on the amount of THC. FAC at ¶ 27. (Tenn. Code Ann. § 43-26-102(4)(B) (Industrial hemp "includes any industrial hemp-derived products that do not contain more than three- tenths of one percent (0.3%) of delta-9 tetrahydrocannabinol (THC) in a topical or ingestible consumer product.")

[3]  Major Sharp's memo states that, on January 30, 2018, he separately telephoned the TBI and asked: "if it was illegal and has it caused (2) two deaths in the US as I had been told." FAC Exhibit 4, p. 2. The memo does not record the TBI's response to this question, except to say that the TBI agent said: "he was not sure if the T.B.I. is willing to put that much man power to it." *Id.* Later that same day, Major Sharp met with other officers and concluded: "Consensus, no one is comfortable moving ahead at this time." *Id.* Read in the light most favorable to Plaintiffs, this sequence of events strongly undermines the reasonableness of any belief that Plaintiffs sold products that were illegal and dangerous, as Major Sharp himself questioned this notion and sought independent corroboration to verify what he "had been told."

other items and began selling 'Hemp Bomb gummy edibles.'") Further lab tests by TBI failed to yield any positive tests for marijuana synthetics. *Id.* One subsequent test came back "inconclusive." *Id.* Another test, as Zimmerman phrased it, revealed "Cannabidiol, BUT did not list it as a schedule VI substance (the schedule column has a hyphen through it)." *Id.* It was in this context that Zimmerman emailed the TBI and stated: "before we indict these owners of businesses, and padlock their businesses, we want to make sure we are understanding what is being offered for sale. Police say we have about 20 businesses and I want to make sure we are on the same page as the expert chemists." *Id.* As alleged in the FAC: "Based on the above email, as of December 17, 2017, Defendant Zimmerman knew that the TBI lab reports were not conclusive as to the legality or illegality of the products sold by Plaintiffs." On these facts, Zimmerman's actions in proceeding with the Operation anyway were clearly unreasonable.

### c. Zimmerman's actions were malicious in that they were improperly motivated by financial gain.

An alternative method of defeating Zimmerman's claim for qualified immunity is to establish that he acted with "malicious intention to cause a deprivation of constitutional rights or other injury." *Stockdale v. Helper*, at *13-14. The FAC alleges facts supporting exactly this finding. Zimmerman was motivated to rush Operation Candy Crush into execution because of a proposed change in civil forfeiture laws. FAC at ¶¶ 39-43. The proposed bill, in key and relevant part, would have amended Tennessee's civil forfeiture laws to specifically exclude CBD products. *Id.* at ¶ 41. When Major Sharp discussed with Zimmerman "the issues about locking the doors and seizing property," Zimmerman reassured him: "They will come in on their court date, plead guilty, pay the fines and get their businesses open. We will put off the court dates, attorneys will get tired of coming to court and settle." *Id.* at ¶ 43. These alleged facts, read in the light most favorable to the Plaintiffs, support a finding that Zimmerman harbored a "malicious intention" to deprive the Plaintiffs of their constitutional rights.

15

### 3. Because Plaintiffs have alleged facts stating claims for constitutional violations, their Conspiracy claims may proceed.

Zimmerman's final argument for Rule 12(b) dismissal concerns Plaintiffs' conspiracy claims under 42 USC §§ 1983 and 1985. "Because Plaintiffs have not established any other actionable tort," Zimmerman argues, "a claim of conspiracy to commit such torts must also be dismissed." Def.'s Mem. at 11. While Zimmerman relies on this Court's opinion in *Chase v. Funk*, No. 3:16-CV- 01579 (M.D. Tenn. Dec. 9, 2016), that case concerned a *state law* civil conspiracy claim, not a § 1983 conspiracy claim. Plaintiffs nevertheless understand the argument to be that Plaintiffs have not alleged an underlying constitutional violation.

As discussed above, however, Plaintiffs have alleged facts supporting their claims for deprivations of their Fourth and Fourteenth Amendment rights. *See supra,* Section 2(a.). These deprivations stem from the "single plan" to shake down the Plaintiffs by arresting them, imposing fines upon them, and threatening to close their businesses. From the outset, Zimmerman directed the investigation and focused it upon Plaintiffs, rather than larger retailers, in part because of Plaintiffs' perceived lack of resources. FAC ¶ at 113. Zimmerman played a key role in formulating this plan, timing it to a potential change in Tennessee law in an effort to maximize the financial recovery for Defendants. Zimmerman repeatedly gave (erroneous) legal advice to investigators, adamantly (and incorrectly) insisting that Plaintiffs had sold illegal marijuana, when in fact they had not. And Zimmerman played a crucial role in reaching out to Defendant Fitzhugh to secure Fitzhugh's support in convincing the skeptical Major Sharp of the merits of Operation Candy Crush. FAC Exhibit 1, "RCSO Investigative Report," at 4. On these facts, Zimmerman "shared in the general conspiratorial objective" and committed an "overt act in furtherance of the conspiracy." *Hooks v. Hooks*, 771 F.2d 935, 944 (6th Cir. 1985). These "overt acts" ensured that Operation Candy Crush would proceed—despite the TBI's warnings that they could not verify THC levels; and despite Major Sharp's well-founded skepticism that no crimes had been

committed—and resulted in the deprivation of Plaintiffs' constitutional rights to be free from false arrest, unlawful seizure, malicious prosecution, and equal protection of the laws.

## CONCLUSION

Neither absolute nor qualified immunity shields Defendant Zimmerman from liability for his unreasonable and malicious deprivations of Plaintiffs' constitutional rights during the investigative phase of Operation Candy Crush. And because Plaintiffs have alleged facts stating claims for deprivations of constitutional rights, their conspiracy claims are legitimately premised on valid underlying § 1983 claims. For these reasons, the motion should be denied.

**DAVID RANDOLPH SMITH & ASSOCIATES**

By: /s/ Christopher W. Smith
Christopher W. Smith, TN BPR #034450
David Randolph Smith, TN BPR #011905
Dominick R. Smith. TN BPR #028783
W. Lyon Chadwick. Jr. TN BPR #029599
1913 21st Avenue South
Nashville, Tennessee 37212
615-742-1775
csmith@drslawfirm.com
drs@drslawfirm.com
dom@drslawfirm.com
lyon@drslawfirm.com

*Attorneys for Plaintiffs*

/s/ Wesley Clark
Wesley Clark, #32611
Frank Brazil, #34586
Brazil Clark, PLLC
2706 Larmon Avenue
Nashville, TN 37204

*Attorney for Plaintiff Rieves*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document was sent via the Court's electronic filing system to all counsel registered in this case on January 2, 2018.

Frank R. Brazil
Wesley B. Clark Brazil Clark, PLLC 2706
Larmon Avenue
Nashville, TN 37204

Nathan D. Cate
Jesse P. Lords
Law Offices of Lords and Cate Washington Square Building
222 2nd Ave. N., Ste. 415 Nashville, TN 37201
*Attorneys for Plaintiff Rieves*

Robert M. Burns
Austin C. Evans
Howell & Fisher, PLLC
Court Square Building
300 James Robertson Parkway #300 Nashville, TN 37201
*Attorney for Town of Smyrna and Kevin Arnold*

Heather Cairns Ross
Tennessee Attorney General's Office PO Box 20207
Nashville, TN 37202
*Attorney for Jennings Jones*
William T. Ramsey
Blind Akrawi
1201 Demonbreun Street, Suite 1000 Nashville, Tennessee 37203
(615) 244-1713 – Telephone
(615) 726-0573 – Facsimile
*Attorneys for John Zimmermann*