# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| JAMES SWAIN RIEVES,<br>SAMY ANGLY, AYOOB AYOOB,<br>LOUIS SHAUN BERBERT,<br>AKRAM BISHARA,<br>ESKANDER ESKANDER,<br>GEORGE HANNA, EHAB MALAYT,<br>ALAA MANKARIOUS,<br>NEVEN MANSOUR,<br>MICHEAL MARCOUS,<br>MENA MIKHAIL,<br>SCOTT RITTER, GINA RITTER,<br>FREDERICK SUBLETT,<br>MARIAN TADROUS, and<br>MICHAEL ZAKARIA,<br><br>     Plaintiffs,<br><br>v.<br><br>TOWN OF SMYRNA, TENNESSEE,<br>SMYRNA POLICE CHIEF KEVIN<br>ARNOLD, in his official and individual<br>capacity, RUTHERFORD COUNTY,<br>TENNESSEE, DISTRICT ATTORNEY<br>JENNINGS JONES, in his individual<br>capacity, ASSISTANT DISTRICT<br>ATTORNEY JOHN ZIMMERMAN, in<br>his individual capacity, and SHERIFF<br>MIKE FITZHUGH, in his official and<br>individual capacity,<br><br>     Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **Case No. 3:18-cv-00965**<br>**Judge Aleta A. Trauger** |

## MEMORANDUM

Before the court are three separate Motions to Dismiss, filed, respectively, by defendants

Rutherford County, Tennessee and Sheriff Mike Fitzhugh ("Rutherford County Defendants")

(Doc. No. 22), Rutherford County Assistant District Attorney John Zimmerman (Doc. No. 34),

and Rutherford County District Attorney General Jennings Jones (Doc. No. 49), under Rule 12(b)(6) of the Federal Rules of Civil Procedure.[1] The plaintiffs oppose each of the motions.

For the reasons set forth herein, all three motions will be denied.

## I.       Factual Allegations and Procedural Background

According to the allegations in the Second Amended Complaint ("SAC") (Doc. No. 44) and the exhibits attached to the first Amended Complaint (Doc. Nos. 5-1 through 5-9), the plaintiffs in this action—James Swain Rieves, Samy Angle, Ayoob Ayoob, Louis Shaun Berbert, Akram Mishara, Eskander Eskander, George Hanna, Ehab Malaty, Alaa Mankarious, Neven Mansour, Micheal Marcous, Mena Mikhail, Scott Ritter and Gina Ritter, Frederick Sublett, Marian Tadrous, and Michael Zakaria—are all citizens and residents of Rutherford County, Tennessee, and each owned and operated a convenience store, tobacco store, or "vape shop" selling a variety of tobacco and other products within Rutherford County. (SAC ¶¶ 1–16, 26.) Twelve of the seventeen plaintiffs are of Egyptian descent. (*Id.* ¶ 27.)

In addition to tobacco and tobacco-related products, the plaintiffs sold industrial hemp-derived products, including products containing cannabidiol ("CBD"), which is legal under both Tennessee and federal law. (SAC ¶ 28 (citing Tenn. Code Ann. § 43-26-102[2]).) Notwithstanding that fact, in February 2017, the Rutherford County Sheriff's Office ("RCSO") began investigating the sale of CBD products. (SAC ¶ 29–32.) As part of their investigation, RCSO officers purchased

---

[1] Defendants the Town of Smyrna, Tennessee and Smyrna Police Chief Kevin Arnold have neither answered nor sought dismissal of the Second Amended Complaint.

[2] While CBD derived from industrial hemp and containing less than .3% tetrahydrocannabinol ("THC") is legal, Tenn. Code Ann. § 43-26-102(4), CBD derived from marijuana appears to be illegal except under certain circumstances. *See* Tenn. Code Ann. § 39-17-402(16). THC is the chemical responsible for most of marijuana's physical and psychological effects. Mosby's Medical Dictionary (9th ed. 2009).

CBD products from plaintiffs Scott and Gina Ritter's store and submitted them for testing by the Tennessee Bureau of Investigation ("TBI"). (*Id.* ¶ 31–32.) RCSO officers then contacted Defendant John Zimmerman, Rutherford Count Assistant District Attorney, to "seek prosecutorial direction on the case." (*Id.* ¶ 33; Doc. No. 5-1.) Zimmerman directed the officers to continue their investigation and, more specifically, to make more CBD purchases, including from outside the city of Murfreesboro. (SAC ¶ 34.) One RCSO officer mentioned that Amazon sold the same products, but Zimmerman "laughed and said we aren't going aft[er] Amazon. He said go to vape stores." (*Id.* ¶ 34; Doc. No. 5-2, at 3.) According to the plaintiffs, Zimmerman "[n]ot only . . . provide[d] legal advice to the law enforcement officers working the case, but crucially, he directed the actions of the law enforcement officers." (SAC ¶ 36.)

From the beginning of the investigation, RCSO officers had doubts as to whether the CBD products were actually illegal and, if so, whether the owners of the businesses selling the products knew they were illegal. The officers had difficulty obtaining clarification from Zimmerman regarding the legal status of the products, and they also expressed the opinion that padlocking the stores and seizing assets, as opposed to first sending notices to cease and desist, was an extreme response, even if the products were actually illegal. (*See* Doc. Nos. 5-1, 5-3, 5-4, 5-6; SAC ¶¶ 38, 41, 44, 45, 47, 49.) Citing an email from Zimmerman to various TBI employees dated December 17, 2017, the plaintiffs allege that Zimmerman knew as of that date that TBI's lab reports on various products being sold by the plaintiffs were inconclusive on the question of whether the products contained any illegal or scheduled substances. (SAC ¶ 38; Doc. No. 5-3.)

On January 12, 2018, Major William Sharp of the RCSO, who was initially tasked with leading the RCSO's investigation, was informed that "TBI does not feel comfortable testifying about the items being legal [sic]." (Doc. No. 5-4, at 1.) Zimmerman at that point insisted that they

were "going ahead with this case" anyway, but Major Sharp instructed other RCSO Officers, who had expressed their discomfort with the fact that no one had explained to them how the CBD products were illegal, "not to make any further buys and to stop any further investigation until I can get some answers." (*Id.*) On January 22, 2018, Major Sharp "briefed the sheriff [defendant Fitzhugh] and [RCSO] Chief Grissom on this case" and "advised [them] that [he] was not comfortable proceeding until [he had] further information." (*Id.*) On January 24, 2018, Major Sharp spoke with defendant Jennings Jones about his understanding of the TBI's concerns and the plan by Zimmerman and Jones to seize property and close stores. Jones "became upset about the T.B.I. and the testing." (*Id.*) As of January 30, 2018, according to Major Sharp, there was a "[c]onsensus" at the RCSO that "no one is comfortable moving ahead at this time." (*Id.* at 2.)

On January 31, 2018, Major Sharp told Chief Grissom: "I still have concerns with Narc case [and am] leaning towards putting it off." (*Id.*) On February 1, 2018, Major Sharp met with Jones. (*Id.*) At this meeting, Sharp detailed his specific concerns regarding the investigation. On his timeline of events, Sharp listed his concerns as follows:

1. Legal or not.

2. Where were the store owners buying the oils from?

3. Locking the doors.

4. The owners lack knowledge of it being illegal.

5. Law suites [sic].

6. Public opinion.

7. Opioid problem.

8. I also spoke about slowing the investigation down, letting the owners know their product may be illegal.

9. Putting off until next grand jury.

(Doc. No. 5-4, at 2.) According to Sharp, Jones assured him that CBD was an illegal Schedule VI

narcotic and that the TBI was on board with pursuing the case. (*Id.*) As a result, Sharp "felt good after this conversation." (*Id.*)

However, the plaintiffs allege that, at some point in the process, Jones and Zimmerman had become dissatisfied with Major Sharp's inclination to postpone advancement of the case and had gone above his head, to Sheriff Fitzhugh and two Chiefs. (SAC ¶ 51; RCSO Investigative Report by Lt. J. Matthew Goney, J.D., Legal Advisor, Office of Professional Responsibility, RCSO ("Investigative Report"), Doc. No. 5-1, at 4, 24.) According to the Investigative Report, Fitzhugh was not willing to overrule Sharp's decision but instead allowed the District Attorney's Office ["DA's Office"] to "set up another meeting with Major Sharp and multiple narcotics detectives." (*Id.* at 4.) This meeting took place on February 2, 2018 and was attended by Jones, Zimmerman, and Assistant District Attorney Farmer, as well as Sharp and several detectives. At this meeting, Zimmerman continued to insist that CBD was illegal and being sold without a prescription. In response to Sharp's concerns about "locking the doors and seizing property," Zimmerman said: "'They will come in on their court date, plead guilty, pay the fines and get their businesses open.' 'We will put off the court dates, attorneys will get tired of coming to court and settle.'" (*Id.*; *see also* SAC ¶¶ 44–45.)

Although the meeting was "contentious," and the detectives again expressed their concerns, the representatives from the DA's Office assured them again that the substances being sold at the plaintiffs' shops were illegal. (Doc. No. 5-1, at 4–5.) The plaintiffs allege that Fitzhugh agreed to allow the operation to take place over the objections of Sharp and the detectives who had been working the investigation. (SAC ¶ 131.) The Investigative Report itself simply states: "Operation Candy Crush was executed on February 12, 2018." (Doc. No. 5-4, at 5.) As part of the operation, the plaintiffs were arrested and charged with violating the Tennessee Drug Control Act, Tenn.

Code Ann. § 39-17-417. Their stores were padlocked and their assets seized. (SAC ¶ 54.)

The plaintiffs allege that the introduction of new Tennessee legislation in early 2018, approximately two weeks before Operation Candy Crush was executed, if passed, would have amended Tennessee's civil forfeiture laws to specifically exclude CBD products. (SAC ¶¶ 42–43.) According to the plaintiffs, one of Zimmerman's goals in pushing forward with execution of the plan, instead of moving slowly as Sharp and the detectives wanted to do, was to move before the proposed legislation was enacted in order to exact civil forfeiture from the plaintiffs, knowing they would have little recourse under the law. (*Id.* ¶ 44.)

Immediately following execution of Operation Candy Crush, leading law enforcement officers staged a televised press conference in front of Scott and Gina Ritter's store. (SAC ¶ 53.) Defendants Jennings Jones, Mike Fitzhugh, and Kevin Arnold spoke at the press conference. Fitzhugh described the Operation and stated that the RCSO and Smyrna Police Department, together, had conducted raids on 23 stores for selling products containing a "marijuana derivative." (SAC ¶ 56.) With no facts to support his assertions, Fitzhugh claimed that the store owners acted illegally:

> What they do is they take these candies. They take them out of the package. They spray them with this illegal substance. And then they repackage them. Where you buy these in the store for a normal price, they repackage these and they go up $2.70 a package. This is an example of what they've done. They've taken gummy worms and infused them with the illegal substance. And then they repackage them in a different package.

(SAC ¶ 58.) According to Plaintiffs, these statements were complete fabrications, as there was no evidence that any plaintiff had tampered with product packaging or infused any products with an illegal substance. (SAC ¶ 59.)

Defendant Kevin Arnold defended the actions by stating that a judge had approved the lock-down of each store. (SAC ¶ 66.) Plaintiffs allege that Judge Royce Taylor approved the

"nuisance petitions" on the basis of false affidavits submitted by RCSO Detective Beane that were specifically approved by Zimmerman and Jones, when Zimmerman and Jones had actual knowledge that the statements in the affidavits submitted to Judge Taylor were false. (SAC ¶¶ 67–78.)

A day after the press conference, Zimmerman spoke on the phone with an attorney who represents the company that manufactured some of the candies that were at issue in Operation Candy Crush. The attorney attempted to explain to Zimmerman that the products were legal under federal and state law. Zimmerman responded that "all the people selling CBD in Rutherford County are 'foreigners.'" (SAC ¶ 87.) The plaintiffs allege that other businesses in Rutherford County that were selling CBD products but were not owned or operated by immigrants were not targeted in Operation Candy Crush. (*Id.* ¶¶ 88–91.) They allege, for example, that three stores owned by plaintiff George Hanna, who is of Egyptian descent, were padlocked as nuisances, while several gas stations located in the same vicinity as Hanna's stores and that sold the same products were not raided or padlocked by law enforcement. (*Id.*)

Defendant Jones issued a Press Release dated February 28, 2018 to "cast blame on the TBI" for the Operation. (SAC ¶ 92.) The Press Release, which is attached as an exhibit to the plaintiffs' pleading, reflects that Jones had submitted the TBI's lab reports along with other information concerning the investigation into the products being sold by the plaintiffs to a Grand Jury, which had returned "true bills," and to Judge Royce Taylor in support of Jones' Petitions for Abatement of a Nuisance. The Press Release states in pertinent part:

> The [DA's Office] initiated actions to enforce the law in this case because the TBI assured us that the items being sold at various businesses in Rutherford County were infused with illegal controlled substances. . . .
>
> After all the TBI lab reports were received in this investigation, the information concerning the investigation coupled with the findings of the TBI lab were

presented to the Rutherford County Grand Jury and then to Circuit Judge Royce Taylor. These TBI lab reports were filed with the court by my office and constitute public records. The Grand Jury returned true bills because the TBI lab reports stated that the substances within the edible products contained illegal controlled substances. The TBI lab reports and reports of the investigations were also presented to Judge Taylor as part of a petition to declare these businesses as public nuisances under the law. State law declares that any building used in the selling of controlled substances constitutes a public nuisance. Judge Taylor found probable cause that each business was operating as a public nuisance based, in part, upon the findings contained in the TBI lab reports that the products contained a Schedule VI controlled substance. Judge Taylor then ordered law enforcement agencies to padlock each business pending a hearing in court . . . .

Since the TBI lab cannot conclusively establish in court that the cannabidiol they detected was derived from a marijuana plant, the State cannot prove the substance is actually a Schedule VI controlled substance. The TBI lab reports constituted the foundation of all indictments and nuisance actions in this case.

(Doc. No. 5-8, at 1–2.)

The TBI, however, subsequently refuted Jones' contention that the TBI had "assured" the

DA's Office that the products being sold by the plaintiffs contained "illegal controlled substances."

(SAC ¶ 85.) The TBI issued its own statement on February 28, 2018:

In this matter, it is inaccurate for the local stakeholders in these cases to assert they made decisions in this case unaware of the limits of our forensic work. . . .

Our laboratory analysis can only determine relevant compounds, not the particular origin of those substances. So, in this matter, we are not able to determine whether the CBD in these cases originated from industrial hemp, illicit marijuana, or synthetic production. In fact, such a determination is beyond the capability of contemporary drug identification. Still, the identified CBD, as a derivative of marijuana, may be considered a Schedule VI substance under the Tennessee Code, which is why our agency reported it that way to the local law enforcement agency and District Attorney General.

In the midst of this process, we clearly explained—in detail—the limitations of our analysis to all stakeholders. We did so to ensure they fully knew that, though we could identify CBD, we were not able to identify its origin.

We also explained to them the nuance of the included schedule on our lab reports, which are provided as a courtesy. In this instance, we listed the schedule out of an abundance of caution because the sample could have met the standard for schedule [VI] as spelled out in the law. Local agencies and prosecutors—including those in Rutherford County—are well aware of that nuance.

During the recent news conference on these cases, General Jones acknowledged himself that a substance being identified as a particular schedule does not make it inherently illegal. The circumstances of the possession or transfer—as determined by the local law enforcement agency and interpreted by the District Attorney General—make something "illegal."

Again, to be clear: TBI lab reports objectively determine the compound present, but in no way are statements of compound origin, circumstances of possession, or guilt or innocence.

(Doc. No. 5-9, at 1–2.)

In other words, according to the TBI, it had informed Jones of the "limitations of [its] analysis" before Jones and his office obtained the indictments and nuisance petitions. The TBI's memo is also consistent with Major Sharp's memo dated January 12, 2018, noting that he was informed that "TBI does not feel comfortable testifying about the items being legal." (Doc. No. 5-4, at 1.)

All charges against all plaintiffs were dismissed and expunged. (SAC ¶ 84.) Although the plaintiffs do not specifically state as much, the court infers from the SAC and exhibits that the plaintiffs were permitted to reopen their stores and that Rutherford County did eventually "return the money, oils and property" to them. (*See* Doc. No. 5-4, at 3.)

Plaintiff James Rieves alone filed the Complaint initiating this action on September 25, 2018, against the Town of Smyrna, Police Chief Arnold, Rutherford County, Sheriff Fitzhugh, District Attorney Jones, and Assistant District Attorney Zimmerman. The first Amended Complaint (Doc. No. 5), along with numerous exhibits, was filed on October 15, 2018, before any defendant was served or had answered. The Amended Complaint was filed on behalf of each of the plaintiffs who are now parties to the case. The plaintiffs filed the SAC, with leave of court and without opposition from any defendant, on January 2, 2019. The parties agree that the SAC does not substantially modify the first Amended Complaint and did not moot the Motions to Dismiss that had already been filed by the Rutherford County Defendants and Zimmerman. Defendant

Jones' Motion to Dismiss was filed shortly after the SAC.[3]

In the operative pleading, the plaintiffs assert three claims, two under 42 U.S.C. § 1983 and one under 42 U.S.C. §§ 1983 and 1985, for violations of their rights under the Fourth and Fourteenth Amendments and conspiracy to violate those rights. More specifically, Count I asserts that all defendants violated the plaintiffs' rights under the Fourth and Fourteenth Amendments to be free from false arrest, unlawful seizure, and unlawful prosecution. The plaintiffs assert that Jones and Zimmerman "undertook investigatory functions usually conducted by police" and that, acting under color of law, they "pushed law enforcement agencies to move Operation Candy Crush forward," despite legitimate concerns raised by the investigating police officers. The plaintiffs claim that all defendants knowingly participated in the illegal seizure, arrest, criminal prosecutions and nuisance petitions against the plaintiffs, despite actual knowledge that the plaintiffs were being arrested for conduct that was not illegal. (SAC ¶¶ 112–15.)

Count II asserts a claim under § 1983 based on the plaintiffs' allegations that the defendants violated their right to equal protection by targeting them because they were small business owners rather than large operations such as Amazon or Wal-Mart, which sold the same CBD products as the plaintiffs. This count alleges that the defendants believed that the plaintiffs would be more easily intimidated than large companies into paying significant fines and agreeing to forfeit property to resolve the civil claims and criminal charges against them. (SAC ¶ 118, 210.) The

---

[3] Two of the three Motions to Dismiss were filed following the plaintiffs' submission of the first Amended Complaint but prior to the filing of the SAC. The court gave notice that it presumed that the SAC rendered moot the pending Motions to Dismiss but directed any party disagreeing with that presumption to so notify the court. (*See* Doc. No. 45.) On January 9, 2019, the parties filed a joint Notice of Agreement, confirming that no party opposed the filing of the SAC, that the "revisions included in the [SAC] do not affect the substance of the arguments made in each motion to dismiss," and that each of the pending motions should be considered on the merits. (Doc. No. 47.)

plaintiffs assert that the defendants "selectively enforced the law, as they misunderstood it, against Plaintiffs" *because* the plaintiffs lacked the resources to defeat the charges against them and that this was an arbitrary classification based on commercial size and financial standing. (SAC ¶¶ 121–22.)

Count III, under §§ 1983 and 1985, asserts that defendants Jones, Zimmerman, Arnold (sued in their individual capacity only), and Fitzhugh (sued in both his individual and official capacities) conspired to violate the plaintiffs' rights under the Fourth and Fourteenth Amendments, that they were motivated by the prospect of financial gain, that they unlawfully targeted small businesses known or believed to be owned by persons of Egyptian descent, and that the defendants were aware when they took action against the plaintiffs that they did not have probable cause to arrest the plaintiffs, seize their property, and padlock their businesses. (SAC ¶¶ 125–32.)

All defendants except the City of Smyrna and Police Chief Kevin Arnold have moved for dismissal of the claims against them.

## II. Standard of Review

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require that a plaintiff provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (quoting Fed. R. Civ. P. 8(a)(2)). The court must determine whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S.

506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action"; instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## III. Analysis

All of the plaintiffs' claims are premised upon violations of their constitutional rights, rendered actionable under 42 U.S.C. § 1983, conspiracy to violate rights protected by § 1983 or, alternatively, conspiracy to violate rights protected by the Equal Protection Clause, under 42 U.S.C. § 1985(3).

Section 1983 permits a claim for damages against "[e]very person who, under color of [state law], subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. To state a claim under § 1983, a plaintiff must allege and show two elements: (1) that he was deprived of a right secured by the Constitution or laws of the United States; and (2) that the deprivation was caused by a person acting under color of state law. *Tahfs v. Proctor*, 316 F.3d 584, 590 (6th Cir. 2003); 42 U.S.C. § 1983.

A plaintiff may successfully plead a § 1983 conspiracy by alleging that (1) a single plan existed, (2) the conspirators shared a conspiratorial objective to deprive the plaintiffs of their constitutional rights, and (3) an overt act in furtherance of the plan was committed. *Revis v. Meldrum*, 489 F.3d 273, 290 (6th Cir. 2007). "Express agreement among all the conspirators is not

necessary to find the existence of a civil conspiracy [and] [e]ach conspirator need not have known all of the details of the illegal plan or all of the participants involved." *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011) (alterations in original; citation omitted). However, a civil conspiracy claim must be pleaded with some degree of specificity. *Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003). Vague and conclusory allegations unsupported by material facts are insufficient to state a claim. *Id.* A plaintiff need not allege or produce direct evidence of a conspiracy; "circumstantial evidence may provide adequate proof." *Id.* (quoting *Weberg v. Franks*, 229 F.3d 514, 528 (6th Cir. 2000)).

To state a claim under § 1985(3), a plaintiff must allege: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges or immunities of the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *United Bhd. of C & J v. Scott*, 463 U.S. 825, 828–29 (1983). The acts alleged to have deprived the plaintiffs of equal protection must be the result of class-based discrimination. *Vakilian v. Shaw*, 335 F.3d 509, 518–19 (6th Cir. 2003).

## A.    Rutherford County Defendants

The plaintiffs assert claims against Rutherford County and against Sheriff Fitzhugh in both his official and individual capacities, based on the RCSO's participation in the raid on the plaintiffs' stores and the plaintiffs' arrests in violation of the Fourth Amendment. The Rutherford County Defendants assert that the SAC fails to state a claim against Fitzhugh individually for which relief may be granted, Fed. R. Civ. P. 12(b)(6), and that, even assuming the plaintiffs have pleaded colorable claims, such claims are barred by the doctrines of quasi-judicial immunity and/or qualified immunity.

Regarding the claims against Rutherford County and the official-capacity claims against Fitzhugh, the defendants argue that these should be dismissed under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), because the SAC does not allege that a municipal policy or custom caused the plaintiffs' injuries or was the moving force behind the alleged constitutional violations. They argue that the equal-protection claim in Count II of the Amended Complaint is subject to dismissal because small business owners do not fall within a constitutionally protected category and that the plaintiffs fail to allege the *prima facie* elements of a conspiracy claim in Count III with the requisite specificity.

### 1.     *Individual Capacity Claims Against Sheriff Fitzhugh*

The SAC alleges that the RCSO began investigating the sale of CBD products in Rutherford County in February 2017 and that, at some point, the individual detectives involved in the investigation sought guidance from Assistant District Attorney John Zimmerman for "prosecutorial direction." (SAC ¶ 33.) In the "Factual Allegations" section of the SAC, the plaintiffs do not allege that Fitzhugh instigated or personally participated in the detectives' investigation into the sale of CBD products in Rutherford County while it was taking place. The first mention of Fitzhugh in the SAC appears in paragraph 50, which asserts that the Investigative Report completed in April 2018 by Lt. J. Matthew Goney, J.D., Legal Advisor, Office of Professional Responsibility, Rutherford County Sheriff's Office (Doc. No. 5-1, at 45), "also describes the personal involvement of Defendant Rutherford County Sheriff Mike Fitzhugh in advancing the Candy Crush operation." (SAC ¶ 50.)

According to the Investigative Report, Major Sharp and the detectives investigating the plaintiffs' businesses wanted to postpone further advancement of the case, because they were not persuaded that the CBD products sold at the plaintiffs' stores were actually illegal. Specifically,

"N.D. 1 slow walked the CBD case from going to the Grand Jury in the later part of 2017 because he wanted more assurance the products were illegal." (Doc. No. 5-1, at 4.) Several detectives met with Major Sharp and informed him of their concerns, as a result of which Major Sharp also "leaned toward postponing any advancement of the case." (*Id.*) The recommendation to postpone displeased the DA's Office. As a result, the DA's office went around Sharp to "the highest level of command at the Sheriff's Office" to meet with the Sheriff himself and two Chiefs. (SAC ¶ 51.) The Investigative Report states that Sheriff Fitzhugh "would not override the Major's decision, but instead allowed for the [DA's] Office to set up another meeting with Major Sharp and multiple narcotics detectives." (Doc. No. 5-1, at 4.) That meeting took place on February 2, 2018. (*Id.*; *see also* SAC ¶¶ 44–45.)

Neither the SAC nor the Investigative Report explains precisely what happened between the meeting and the execution of Operation Candy Crush, which took place ten days later, but the plaintiffs allege that "Defendant Fitzhugh agreed to allow Operation Candy Crush to proceed despite the clear objections of his subordinates." (SAC ¶ 131.) From exhibits attached to the plaintiffs' pleading, it appears that Zimmerman and Jones, with the cooperation of a Detective Beane of the RCSO, submitted information to a Rutherford County Grand Jury and obtained indictments against the plaintiffs. Zimmerman and Jones apparently submitted essentially the same information to Judge Taylor of the Rutherford County Circuit Court in support of their Petitions for Abatement of Nuisance, which Judge Taylor granted, issuing orders authorizing the padlocking of the plaintiffs' stores and the seizure of their assets under Tennessee's civil forfeiture statute, Tenn. Code Ann. § 29-3-101 *et seq*.

Fitzhugh argues that he cannot be vicariously liable for the actions of his subordinates and that virtually all of the allegations in the SAC concern the actions of various deputies, and not the

sheriff personally. The law is clear that "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).[4] The plaintiffs allege that Fitzhugh knew or reasonably should have known that the affidavits submitted in support of the indictments and forfeiture orders were false but that he authorized and participated in Operation Candy Crush anyway.

The court finds that the plaintiffs' allegations point to circumstantial evidence that gives rise to the reasonable inference that Fitzhugh was aware that the information submitted in support of the indictments and forfeiture orders was false and that probable cause for the plaintiffs' arrests did not exist, including the sheriff's meeting with representatives from the DA's Office and discussions with Major Sharp and his participation in the televised press conference staged in front of plaintiffs Gina and Scott Ritter's store on February 12, 2018, immediately following the execution of Operation Candy Crush. At the press conference, the sheriff described the operation as a raid on 23 stores for selling products "containing a marijuana derivative" (SAC ¶ 56) and made other comments, both true and false, regarding the course of the investigation and the products seized from the plaintiffs' stores.[5]

Construing the allegations in the SAC in the light most favorable to the plaintiffs, accepting its allegations as true, and drawing all reasonable inferences in their favor, *Directv, Inc.*, 487 F.3d

---

[4] This means, of course, that Fitzhugh cannot be vicariously responsible for Detective Beane's actions, insofar as Beane is alleged to have knowingly or recklessly made false statements material to the prosecution. The plaintiffs have not named Detective Beane as a defendant, even though Beane's affidavits allegedly containing false statements apparently formed the basis for the issuance of the indictments, abatement orders, and, presumably, arrest warrants.

[5] The plaintiffs disclaim any intent to bring defamation claims against Fitzhugh under state law, but they maintain that these allegations are relevant to "establish reputational injury as an element of damages to their claims for selective prosecution, false arrest, unlawful seizure, and unlawful prosecution." (Doc. No. 36, at 8 n.3 (citing *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986)).)

at 476, the court finds that Count I of the SAC states a claim against Sheriff Fitzhugh in his individual capacity, based on his authorization of Operation Candy Crush, despite either knowing that probable cause was lacking or recklessly disregarding the facts establishing an absence of probable cause. The factual content in the SAC just barely allows the court to draw the reasonable inference that defendant Fitzhugh is "liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Besides seeking dismissal for failure to state a claim, Fitzhugh also asserts that he is entitled to quasi-judicial immunity or, alternatively, qualified immunity. Quasi-judicial immunity generally protects law enforcement officers who act pursuant to a valid court order, because the act of "enforcing or executing a court order is intrinsically associated with a judicial proceeding." *Cooper v. Parrish*, 203 F.3d 937, 948, 949 (6th Cir. 2000) (quoting *Bush*, 38 F.3d at 847). For acts taken in the investigative context, law-enforcement officers enjoy qualified immunity from suit when their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 137 S. Ct. 548, 551 (2017).

Fitzhugh asserts that he is entitled to absolute immunity for enforcing facially valid warrants and court orders. The Sixth Circuit has stated:

> Law enforcement officers are entitled to absolute immunity as long as they are able to show that they were performing a quasi-judicial function. Quasi-judicial immunity extends to those persons performing tasks so integral or intertwined with the judicial process that these persons are considered an arm of the judicial officer who is immune. Law enforcement officials are entitled to absolute quasi-judicial immunity when they act pursuant to a valid court order.

*Cooper*, 203 F.3d at 950 (internal citations omitted). In response, the plaintiffs argue that (1) Fitzhugh is not entitled to absolute immunity based on investigative acts that took place prior to the execution of the court orders; and (2) the court orders were based on false affidavits and information, such that any presumption of probable cause is rebuttable. (Doc. No. 36, at 10.)

The court agrees that actions taken prior to the issuance of the court orders would not be

entitled to absolute immunity. *Spurlock v. Satterfield*, 167 F.3d 995, 1003 (6th Cir. 1999). The plaintiffs' second argument essentially asks whether Fitzhugh can take refuge behind a facially valid order when he allegedly knew that it was supported by false information, a question that *Cooper* did not answer and that neither party actually addresses. At this juncture, the court finds that Fitzhugh has not established that absolute immunity extends this far. *See Burns v. Reed*, 500 U.S. 478, 486 (1991) (noting that the defendant seeking absolute immunity "bears the burden of showing that such immunity is justified for the function in question").

Fitzhugh also claims qualified immunity, which shields government officials from personal liability for civil damages, "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Everson v. Leis*, 556 F.3d 484, 493 (6th Cir. 2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In concluding that the SAC states a claim against him in his personal capacity, the court has found that the SAC both states a claim for a constitutional violation and alleges that Fitzhugh knew or reasonably should have known that the plaintiffs' arrests were being effected without probable cause. For purposes of the motion to dismiss the claims against Fitzhugh, the court finds that qualified judicial immunity does not apply. The court will deny Fitzhugh's motion to dismiss Count I of the SAC

Fitzhugh also moves for dismissal of Count II, in which the plaintiffs allege violations of the Equal Protection Clause of the Fourteenth Amendment. The Equal Protection Clause demands that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). To state a colorable equal protection claim based upon selective enforcement, the plaintiffs must allege facts showing that (1) they were treated differently than others similarly situated; and (2) such selective treatment was based either on "some bad

reason" or on "no reason at all," that is, no rational basis. *Boone v. Spurgess*, 385 F.3d 923, 932 (6th Cir. 2004) (citing *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 565 (2000) (per curiam).

In support of Count II, the plaintiffs allege that they were impermissibly targeted by law enforcement because they were small businesses rather than large multi-national businesses like Wal-Mart and Amazon and that the defendants had a "bad" motive for targeting them: financial gain and, more specifically, an expectation that, even though probable cause was lacking for the arrests and forfeiture orders, the plaintiffs, as owners and operators of small, local businesses, could be easily intimidated into paying fines and forfeiting property to resolve the baseless claims against them. (*See* SAC ¶¶ 113, 40–44.) The defendants, in seeking dismissal of this case, do not address that argument, and they cite Sixth Circuit precedent (*Stemler v. City of Florence*, 126 F.3d 856 (6th Cir. 1997)) that was clearly superseded by *Olech*. *See Boone*, 385 F.3d at 932 ("The Sixth Circuit has indicated that a claim for selective enforcement, while not limited to the traditional "suspect classes," *see* [*Stemler*, 126 F.3d] at 874, must nonetheless rest on membership in a class and a government actor's animus against that class. . . . This precedent, however, is completely undercut by the cryptically brief decision in [*Olech*]."). The motion to dismiss this claim, too, will be denied.

Regarding Count III, a claim for conspiracy, under § 1983 or § 1985, must be pleaded "with some degree of specificity[,] and . . . vague and conclusory allegations unsupported by material facts will not be sufficient to state a claim." *Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003); *see also Center for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 832 (6th Cir. 2007). The plaintiffs allege that Fitzhugh met with representatives from the DA's Office, authorized one last meeting between Major Sharp and the DA's Office, and authorized the execution of Operation Candy Crush by the RCSO. They also point out that the TBI's Press

Release states that it informed "all stakeholders" of the limitations of its analysis. (Doc. No. 5-9, at 2.) The plaintiffs further argue that the "single plan" that was the objective of the conspiracy consisted of "a scheme to shake down the Plaintiffs by arresting them, imposing fines upon them, and threatening to close their businesses." (Doc. No. 36, at 18.) They argue that Fitzhugh did not need to know "all of the details of the illegal plan or all of the participants involved" in order to participate in the conspiracy: "It is enough that he 'shared in the general conspiratorial objective' of this plan and took the affirmative step—the 'overt act'—of instructing his subordinates to meet with Defendants Zimmerman and Jones and allowing the investigation to proceed." (*Id.* (quoting *Hooks v. Hooks*, 771 F.2d 935, 944 (6th Cir. 1985)).) The court finds, for purposes of the motion to dismiss, that the plaintiffs have stated a colorable claim against Fitzhugh for engagement in a conspiracy under § 1983.

Fitzhugh did not move for the dismissal of the § 1985(3) claim on the basis that the plaintiffs were not members of a protected class within the protection of § 1985(3), even though his Motion to Dismiss was filed before the plaintiffs were granted leave to file the SAC, alleging that they were targeted on the basis of their ethnicity. This claim, too, will, for now at least, be permitted to proceed.

        2.     *Claims Against Rutherford County and Fitzhugh in his Official Capacity*

"[O]fficial-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (quoting *Monell v. New York Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978)). As such, the official capacity claims against Sheriff Fitzhugh are duplicative of the claims against Rutherford County.

In *Monell v. Department of Social Services*, 436 U.S. 658, 691 (1978), the Supreme Court held that "a municipality cannot be held liable solely because it employs a tortfeasor[.]" In other

words, "under § 1983, local governments are responsible only for 'their *own* illegal acts.' They are not vicariously liable under § 1983 for their employees' actions." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986)). Therefore, "a municipality is liable under § 1983 only if the challenged conduct occurs pursuant to a municipality's 'official policy,' such that the municipality's promulgation or adoption of the policy can be said to have 'cause[d]' one of its employees to violate the plaintiff's constitutional rights." *D'Ambrosio v. Marino*, 747 F.3d 378, 386 (6th Cir. 2014) (quoting *Monell*, 436 U.S. at 692).

"Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick*, 563 U.S. at 61. Thus, to state a municipal liability claim, a plaintiff must adequately allege facts showing "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance [of] or acquiescence [to] federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013); *accord Boulton v. Swanson*, 795 F.3d 526, 531 (6th Cir. 2015).

The sole basis for the defendants' motion to dismiss the claims against RCSO and the Sheriff in his official capacity are that the SAC is devoid of allegations that Rutherford County *per se* or the RCSO had a policy or custom that played a part in the alleged violations of federal law. The plaintiffs respond by arguing that Fitzhugh is a "final policymaker for Rutherford County under Tennessee law" and, therefore, had sufficient authority "to bind the County through his actions." (Doc. No. 36, at 20, 21 (citing *Spurlock v. Sumner Cty.*, 42 S.W.3d 75 (Tenn. 2001)).) They also argue that the Supreme Court has held that "municipal liability under § 1983 attaches where . . . a deliberate choice to follow a course of action is made from among various alternatives

by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1985).

Citing *Pembaur*, the plaintiffs also insist that "Fitzhugh's decision to convene a meeting with Prosecutors and to allow Operation Candy Crush to proceed was unquestionably a decision by a county official with final decision-making authority. . . . Fitzhugh made the decision to 'follow the course of action' of arresting the Plaintiffs and padlocking their businesses 'from among various alternatives.'" (Doc. No. 36, at 25 (quoting *Pembaur*, 475 U.S. at 483).)

In *Pembaur*, two sheriff's deputies attempted to serve arrest capiases upon employees who worked at the plaintiff's medical clinic. The plaintiff refused them entry, so the deputies called their supervisor for further instructions. Their supervisor told them to call the Assistant County Prosecutor and to follow his instructions. The Assistant Prosecutor conferred with the County Prosecutor and then instructed the deputies to "go in and get [the witnesses]." *Pembaur*, 475 U.S. at 473. The deputy sheriffs attempted once more to obtain permission to open the door and then to force the door. Unsuccessful in both these attempts, they finally obtained an axe and chopped down the door. Pembaur filed suit under § 1983 on the basis that the search violated his rights under the Fourth Amendment, based on the Supreme Court's determination that, absent exigent circumstances, the Fourth Amendment prohibits police from searching an individual's home or business without a search warrant, even to execute an arrest warrant for a third person.

The district court dismissed the claims against the county and city on the grounds that the individual officers who chopped down the door were not acting pursuant to official county policy. The Sixth Circuit affirmed, largely because it concluded that a "single, discrete decision is insufficient, by itself, to establish [implementation of] a governmental policy." *Id.* at 476–77. The Supreme Court reversed, while reaffirming *Monell*'s holding that a municipality can only be liable

for actions for which the municipality is actually responsible, that is, acts that the municipality has officially sanctioned or ordered. *Pembaur*, 475 U.S. at 478–79. Based on that understanding, the Court concluded that "municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *Id.* at 480. If the decision to adopt a particular course of action is "directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly." *Id.* at 481.

In this case, the facts as alleged in the SAC, or derived from the Investigative Report upon which the plaintiffs heavily rely, do not actually indicate how the RCSO reached the decision to participate in the raid, but, regardless of who made the decision, the ultimate authority to ratify it rested with the Sheriff, under state law. *See Spurlock*, 42 S.W.3d at 77 (rejecting Sumner County's argument that the sheriff could not act as the "final policymaking authority for the county" because he was a state official rather than a county officer, and finding that a sheriff acting in a law enforcement capacity serves as a county official). Thus, at least for purposes of the motion to dismiss, the sheriff's decision to go forward with Operation Candy Crush, despite the absence of probable cause for the arrests or civil forfeitures, may appropriately be attributed to the county as a final decision by an ultimate decisionmaker that constituted the implementation of a governmental policy.

In their Reply, the defendants further argue that dismissal of the claims against the RCSO is required because "the gravamen of the Plaintiffs' Amended Complaint is about the prosecution of the Plaintiffs" and the Sheriff did not make policy with respect to prosecution decisions. (Doc. No. 51, at 7.) This argument is unavailing for the simple reason that the plaintiffs also complain that the raid and arrests themselves constituted false arrests in violation of their rights under the

Fourth Amendment. The court will therefore deny the motion to dismiss the claims against Rutherford County and Sheriff Fitzhugh in his official capacity.

### B.    Zimmerman's and Jones' Motions

Defendants Zimmerman and Jones, respectively a Rutherford County Assistant District Attorney and the District Attorney, both assert that they are entitled to absolute prosecutorial immunity for actions taken within the scope of their prosecutorial duties or, alternatively, to qualified immunity for actions that were not taken in their capacity as advocates for the State.[6]

The plaintiffs concede that prosecutors will be entitled to absolute immunity for activities "intimately associated with the judicial phase of the criminal process," but they argue that, under *Burns v. Reed*, 500 U.S. 478 (1991), Zimmerman and Jones may claim only qualified immunity, rather than absolute, for such activities as directing the course of the investigation during the investigative phase of a criminal case and giving the police legal advice. (Doc. No. 41, at 7.) The plaintiffs further maintain that Zimmerman and Jones are not entitled to qualified immunity for advising and directing the law enforcement officers, because they knowingly provided false information to the grand jury and Judge Taylor, acted unreasonably in pursuing Operation Candy Crush, and were motivated by financial gain.

### 1.    *Legal Standards: Absolute and Qualified Immunity*

The law is clear that prosecutors are absolutely immune from liability under § 1983 for conduct that is "intimately associated with the judicial phase of the criminal process," including "initiating a prosecution and in presenting the State's case." *Imbler v. Pachtman*, 424 U.S. 409, 430, 431 (1976). Such absolute liability encompasses even the knowing use of false testimony at

---

[6] The plaintiffs disclaim any intent to sue Jones in his official capacity, so the court will not address his motion to dismiss any official-capacity claims.

trials and other court hearings, as well as the deliberate suppression of exculpatory evidence. *Id.* at 413, 432–33; *Burns*, 500 U.S. at 486. Absolute immunity also extends to the actions of prosecutors in preparing and filing public nuisance and civil forfeiture complaints. *Red Zone 12 LLC v. City of Columbus*, No. 18-3363, 2019 WL 852294, at *4 (6th Cir. Feb. 21, 2019); *see also Blakely v. United States*, 276 F.3d 853, 871 (6th Cir. 2013) (applying immunity to civil forfeiture); *Cooper v. Parrish*, 203 F.3d 937, 947 (6th Cir. 2000) (applying immunity to civil nuisance and forfeiture).

The *Imbler* Court expressly reserved judgment on the questions of whether absolute immunity extended to actions taken by a prosecutor in his role as "administrator or investigative officer" and what "aspects of the prosecutor's responsibility . . . cast him in th[at] role." *Imbler*, 424 U.S. at 430–31. At the same time, the Court recognized that "the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom." *Id.* at 431 & 33. Later Supreme Court decisions "are consistent with the functional approach to immunity employed in *Imbler*." *Burns*, 500 U.S. at 486 (collecting cases).

Later cases have also confirmed that a prosecutor seeking absolute immunity "bears the burden of showing that such immunity is justified for the function in question." *Id.* (citations omitted). The presumption is that qualified immunity, rather than absolute, applies. *Id.* In *Burns*, the Court held that a prosecutor was entitled to absolute immunity in connection with his appearance as a lawyer for the State in a probable cause hearing but reached a different conclusion regarding the prosecutor's actions in providing legal advice to the police. *Id.* at 491–92. Rejecting the argument that giving legal advice is "of a judicial nature," the Court stated: "We do not believe . . . that advising the police in the investigative phase of a criminal case is so 'intimately

associated with the judicial phase of the criminal process' that it qualifies for absolute immunity." *Id.* at 493 (quoting *Imbler*, 424 U.S. at 430). The central purpose of absolute prosecutorial immunity, the Court reasoned, is "to free the judicial process from the harassment and intimidation associated with litigation." *Id.* at 494. But that concern "justifies absolute prosecutorial immunity only for actions that are connected with the prosecutor's role in judicial proceedings, not for every litigation-inducing conduct." *Id.* The Court also reconfirmed that it has been "quite sparing" in its recognition of absolute immunity and has refused to extend it "further than its justification would warrant." *Id.* at 487 (citation omitted).

Even if a government official is not entitled to absolute immunity, he may claim qualified immunity, which shields government officials from personal liability for civil damages, "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Everson v. Leis*, 556 F.3d 484, 493 (6th Cir. 2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Questions of qualified immunity should be resolved 'at the earliest possible stage in litigation,' or else the 'driving force' behind the immunity—avoiding unwarranted discovery and other litigation costs—will be defeated." *Everson*, 556 F.3d at 492 (quoting *Pearson v. Callahan*, 555 U.S. 223, 231–32 (2009)). Once the issue is raised, "it is the plaintiff's burden to show that the defendants are not entitled to qualified immunity." *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013). When resolving government officials' qualified immunity claims, courts conduct a two-pronged inquiry, asking: (1) "whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right"; and (2) "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson*, 555 U.S. at 232 (internal citations omitted). These two prongs, which a court can address in whichever order it deems appropriate, must both be answered in the

affirmative in order for a plaintiff to defeat a defendant's claim of qualified immunity. *Id.* at 236.

In evaluating whether the defendants violated the plaintiffs' clearly established rights, the court draws all reasonable inferences in the plaintiffs' favor but must consider "only the facts that were knowable to" the defendants at the time they acted. *White v. Pauly*, 137 S. Ct. 548, 550 (2017). Further, it is a "longstanding principle that 'clearly established law' should not be defined 'at a high level of generality.'" *Id.* at 552 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). Rather, "the clearly established law must be 'particularized' to the facts of the case." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "Otherwise, [p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Id.*

### 2. Absolute Immunity

Based on the well established precedent discussed above, it is clear that Zimmerman and Jones are absolutely immune from liability for making the decision to proceed with prosecuting the plaintiffs, allegedly presenting knowingly false affidavits to the Grand Jury in order to obtain indictments, and presenting the same allegedly false affidavits and making false statements of fact to Judge Taylor in support of the Petitions for Abatement of Nuisance. The plaintiffs effectively concede that absolute immunity in connection with those actions is appropriate and have largely steered clear of seeking to impose liability on Zimmerman and Jones for those activities that are "intimately associated with the judicial phase of the criminal process." *Burns*, 500 U.S. at 493. To the extent that the plaintiffs seek to assert equal protection or conspiracy claims against Zimmerman and Jones based on the actions that are "intimately associated with the judicial phase," those claims fail too. *See, e.g.*, *Martin v. Keitel*, 205 F. App'x 925, 927 (3d Cir. 2006) (dismissing equal protection claim against state prosecutor, noting that the act of preparing an indictment—

even of wrongfully doing so . . . —clearly qualifies [for absolute immunity]").

### 3. Qualified Immunity

Instead, the plaintiffs argue that Zimmerman and, to a lesser extent, Jones, are liable for giving legal advice to the police and directing their activities during the investigatory phase of the prosecution. (*See* SAC ¶¶ 29, 33–37.) They allege that both Zimmerman and Jones knew well before Operation Candy Crush was executed that the TBI could not, and would not, verify that the plaintiffs' products were illegal, that the TBI's lab reports were inconclusive, and that, as a result, probable cause was lacking. These defendants also sought to push forward with the civil forfeitures, despite a viable legal basis for doing so, and knowingly pursued cases primarily against small businesses owned and operated by immigrants rather than those owned and operated by large entities or by non-immigrants. Despite the absence of probable cause, Zimmerman and Jones allegedly pushed the RCSO to move forward with the raid on the plaintiffs' stores. The plaintiffs argue that all of these actions occurred during the investigative phase of the proceeding.

As set forth above, the *Burns* Court held that "advising the police in the investigative phase of a criminal case" is entitled only to qualified ,rather an absolute, immunity. *Burns*, 500 U.S. at 493. In considering the defendants' claims for qualified immunity for acts during the investigative phase, the court must ask (1) "whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right"; and (2) whether it was objectively reasonable for the defendants to believe their acts did not violate those rights. *Anderson v. Creighton*, 483 U.S. 635, 638–39 (1987) (internal citations omitted).

Here, the constitutional right at issue is the right to be free from an arrest without probable cause. More particularly, the question is whether Zimmerman and Jones reasonably believed that the presence of CBD in the products being sold by the plaintiffs, standing alone, provided probable

cause to arrest them, which is what Zimmerman and Jones allegedly advised the police officers with whom they were coordinating. The right to be free from an arrest unless it is supported by probable cause was clearly established at the time of the plaintiffs' arrests in early 2018. *See, e.g.*, *Crockett v. Cumberland Coll.*, 316 F.3d 571, 580 (6th Cir. 2003) ("[I]t is well established that any arrest without probable cause violates the Fourth Amendment."). Moreover, there is at least a question of fact as to whether Zimmerman and Jones were reasonable in believing that probable cause to arrest the plaintiffs existed under the particular facts of this case.

Regarding the second prong of the qualified immunity test, the facts are unclear at this juncture regarding to what extent the police officers relied on Zimmerman's and Jones' directives and legal advice in effectuating the arrests. However, construed in the light most favorable to the plaintiffs, the SAC gives rise to an inference that the RCSO moved forward with Operation Candy Crush only because Zimmerman and Jones repeatedly (and unreasonably) told its officers that the plaintiffs were selling illegal products. The court finds that the SAC states a claim against Jones and Zimmerman for violation of the plaintiffs' rights under the Fourth Amendment.

"Dismissals on the basis of qualified immunity are generally made pursuant [to] summary judgment motions, not 12(b)(6) sufficiency of pleadings motions." *Grose v. Caruso*, 284 F. App'x 279, 283 (6th Cir. 2008) (citations omitted). The Sixth Circuit permits a reviewing court to dismiss under Rule 12(b)(6) based on qualified immunity, but "[q]ualified immunity is an affirmative defense, and a plaintiff does not need to anticipate it to state a claim." *Jackson v. Schultz*, 429 F.3d 586, 589 (6th Cir. 2005). In other words, there is no heightened pleading standard for claims brought under Section 1983. *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 166–67 (1993). Accordingly, Zimmerman's and Jones' motions to dismiss Count I of the SAC on the basis of qualified immunity will be denied.

Neither Jones nor Zimmerman has moved for dismissal of the equal protection claim set forth in Count II of the SAC. They move for dismissal of the conspiracy claim set forth in Count III, but only on the ground that the allegations in the SAC do not establish the existence of an actionable tort. (Doc. No. 34, at 11; Doc. No. 50, at 15 n.9 ("Moreover, a conspiracy claim 'requires an underlying predicate tort allegedly committed pursuant to the conspiracy.'" (quoting *Chase v. Funk*, No. 3:16-cv-1579, 2016 WL 7180150 at \*6 (M.D. Tenn. Dec. 9, 2016)).) Because the court finds, at least at this juncture, that the plaintiffs have stated a claim for an actionable tort, the court will not dismiss Count III either.

## IV. Conclusion

For the reasons set forth herein, all three Motions to Dismiss (Doc. Nos. 22, 34, 49) will be denied. An appropriate Order is filed herewith.

ENTER this 6th day of March 2019.

_____
ALETA A. TRAUGER
United States District Judge