# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

|  |  |  |
|---|---|---|
| **JAMES SWAIN RIEVES et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:18-cv-00965** |
| | ) | **Judge Aleta A. Trauger** |
| **TOWN OF SMYRNA, TENNESSEE et al.,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Before the court is the Motion for Summary Judgment filed by defendants Rutherford County, Tennessee and Rutherford County Sheriff Mike Fitzhugh (collectively, the "County Defendants"). (Doc. No. 110.) Also pending is plaintiff James Rieves's Motion for Leave to File Supplemental Facts in support of his opposition to the Motion for Summary Judgment. (Doc. No. 141.)

For the reasons set forth herein, the Motion for Leave to File Supplemental Facts will be denied, and the Motion for Summary Judgment will be granted.

## I.    PROCEDURAL HISTORY

This lawsuit arises from the February 12, 2018 raids on twenty-three stores in Rutherford County that were selling products containing cannabidiol ("CBD") by law enforcement officials with the Rutherford County Sheriff's Office and the Smyrna, Tennessee Police Department ("SPD"), among other local, state, and federal law enforcement agencies. The owners of the stores were arrested and charged with violating the Tennessee Drug Control Act, Tenn. Code Ann. § 39-

17-417, their inventory was seized, and the stores were temporarily padlocked. The coordinated raids were the culmination of an investigation called "Operation Candy Crush."

All charges against the storeowners were eventually dismissed and expunged, as the CBD products at issue were actually legal under both federal and state law. Seventeen store owners, including James Rieves, brought suit in this court asserting claims under 42 U.S.C. §§ 1983 and 1985, alleging that law enforcement officials involved with Operation Candy Crush had violated their constitutional rights to be free from false arrest, unlawful seizure, and unlawful prosecution, as well as their right to equal protection, and had engaged in a civil conspiracy to violate those rights. (Second Amended Compl., Doc. No. 44.) The defendants named in the Second Amended Complaint ("SAC") included SPD Chief Kevin Arnold, in both his official and his individual capacity, the Town of Smyrna (together with Arnold, the "Smyrna Defendants"), Rutherford County District Attorney ("DA") Jennings Jones and Assistant District Attorney ("ADA") John Zimmerman, Rutherford County Sheriff Mike Fitzhugh, in both his official and his individual capacity, and Rutherford County itself.

In March 2019, the court denied Motions to Dismiss filed by the County Defendants, Jones, and Zimmerman. (Doc. No. 60.) The Sixth Circuit thereafter affirmed in part and reversed in part. *Rieves v. Town of Smyrna*, 959 F.3d 678 (6th Cir. 2020). Specifically, the appellate court reversed this court's denial of qualified immunity for defendant Fitzhugh on the plaintiffs' equal protection claim but affirmed this court's ruling in all other respects. *Id.* at 700.

Since then, all claims by all plaintiffs *except* plaintiff James Rieves have been dismissed pursuant to an agreement, and Rieves's claims against defendants Jones and Zimmerman have been dismissed pursuant to an agreement. (Doc. Nos. 103, 104, 136, 137.) In addition, in his Response to the Motion for Summary Judgment, Rieves expressly stipulated to the dismissal of

his claim under 42 U.S.C. § 1985, and he gave notice that he has abandoned any equal protection claim, apparently recognizing that the reasoning behind the Sixth Circuit's granting of qualified immunity on that claim to Fitzhugh would apply equally to the other defendants. (*See* Doc. No. 121, at 16; *id.* at 2 n.1 (citing Doc. No. 119, at 10 n.4).) As a result, the only remaining claims are Rieves's claims against the Smyrna Defendants and the County Defendants under § 1983 for false arrest, unlawful seizure, unlawful prosecution, and conspiracy to violate his constitutional rights.

The County Defendants now seek summary judgment on all of these claims, arguing that (1) Rieves lacks Article III standing to bring the claims against them, because he cannot demonstrate that any injury he suffered is "fairly traceable" to any action by these defendants; (2) Fitzhugh is entitled to summary judgment on the individual capacity claims against him, because he was not personally involved in and did not direct, authorize, or ratify any action that allegedly violated the plaintiff's constitutional rights; (3) the official capacity claim against Fitzhugh and the municipal liability claim against Rutherford County[1] must be dismissed, because the plaintiff does not allege that a municipal policy was implicated in any alleged violation of his rights; and (4) Fitzhugh is entitled to summary judgment on the § 1983 conspiracy claim against him, because he had no personal involvement in the decisions to investigate, pursue, arrest, or prosecute Rieves. (Doc. No. 111.) In support of their Motion for Summary Judgment, the County Defendants have filed a supporting Memorandum of Law (Doc. No. 111), Statement of Undisputed Facts (Doc. No. 112), and evidentiary material in support of their Statement of Undisputed Facts (Doc. Nos. 111-1 through 111-7).

---

[1] The official capacity claims against Fitzhugh are identical to, and redundant of, the municipal liability claims against Rutherford County under § 1983. *See Foster v. Michigan*, 573 F. App'x 377, 390 (6th Cir. 2014) ("Official-capacity claims are 'in all respects other than name, to be treated as a suit against the entity.' Where the entity is named as a defendant, an official-capacity claim is redundant." (quoting *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)).

The plaintiff opposes the Motion for Summary Judgment. (Doc. No. 121.) Although he agrees that each of the facts set forth by the County Defendants is undisputed (*see* Doc. No. 123), he filed his own Statement of Additional Facts that he contends are material to his claims (Doc. No. 122), along with a substantial quantity of evidentiary material (Doc. Nos. 122-1 through 122-29). The County Defendants filed a Reply, as well as a Response to the plaintiff's Statement of Additional Facts in which they agree, for the most part, that these facts, too, are undisputed. (Doc. Nos. 129, 130.)

Discovery was ongoing when the County Defendants filed their Motion for Summary Judgment and when the plaintiff's response thereto became due.[2] In March 2022, after filing his Response in opposition to the Motion for Summary Judgment, the plaintiff conducted the deposition of an additional witness, Major Bill Sharp. He has now introduced into evidence the entire transcript of Sharp's deposition, as well as another witness's Declaration, in conjunction with his Motion for Leave to supplement his Statement of Additional Facts. (Doc. Nos. 141–43.) The County Defendants strenuously object to the plaintiff's Motion for Leave and to his filing of additional evidentiary material in support of that motion. They also request that, if the motion is granted, they be permitted to file an additional reply. (Doc. No. 149.)

The court has taken into consideration the additional evidentiary material submitted by the plaintiff, in recognition of the fact that discovery remained ongoing at the time the plaintiff responded to the Motion for Summary Judgment. At the same time, the court finds that the plaintiff's proposed Statement of Additional Facts and the new evidentiary material do not actually

---

[2] The court previously denied the plaintiff's request that the court defer ruling on the Motion for Summary Judgment and that he be granted an extension until the close of discovery to respond to the motion. (Doc. No. 119.) The denial was without prejudice to the plaintiff's ability to renew the motion if, in responding to the Motion for Summary Judgment, he found that he was in need of specific discovery that he had not yet had the opportunity to take.

contain new material facts and that supplementation and a further response by the County Defendants are unnecessary. The Motion for Leave, therefore, will be denied as moot.

## II.     FACTS[3]

At all material times, defendant Mike Fitzhugh was the Sheriff of the Rutherford County Sheriff's Office ("RCSO"), and plaintiff Rieves owned and operated Platinum Vapor, LLC, d/b/a Cloud 9 Hemp ("Cloud 9") in Smyrna, Tennessee. Cloud 9 sold a variety of tobacco products and industrial-hemp-derived products containing cannabidiol ("CBD").

Rutherford County is a separate legal entity from, and is unaffiliated with, the Town of Smyrna and the SPD. The RCSO is a separate legal entity from, and is unaffiliated with, the Town of Smyrna and the SPD. Sheriff Fitzhugh is not an employee of the Town of Smyrna or the SPD.

### A.     The SPD's Investigation of Cloud 9 in 2017

Around the beginning of May 2017, the SPD became aware that Cloud 9 was selling products that contained CBD. In August 3, 2017, Officer Eric Elstran of the SPD began investigating Cloud 9. On September 13, 2017, Defendant SPD Chief Kevin Arnold e-mailed other law enforcement agencies regarding CBD gummies and stated that he was directing his narcotics detectives to investigate local convenience stores. On September 15, 2017, Arnold and Officer Elstran were made aware of an ongoing investigation into CBD products being conducted independently by the RCSO. Elstran contacted the RCSO to obtain further information. The RCSO asked the SPD if it would assist in future raids of the businesses being investigated.

---

[3] The facts set forth herein for which no citation is provided are drawn from Rieves's Response to the County Defendants' Statement of Undisputed Facts (Doc. No. 112) or the County Defendants' Response to Rieves's Statement of Additional Facts (Doc. No. 130). Unless otherwise indicated, the facts are undisputed for the purposes of the County Defendants' Motion for Summary Judgment.

On September 26, 2017, Officer Elstran and several other officers employed by the SPD conducted a search of Cloud 9 pursuant to a warrant, in the course of which they seized and removed several items from Cloud 9. Officer Elstran and SPD Officer James Willhoite sent the items seized from Cloud 9 to the Tennessee Bureau of Investigation for testing. Following that search and seizure, Rieves sent an email to Elstran explaining that his products were legal. No criminal charges were brought against Rieves at that time.

Fitzhugh was not involved in the investigation of Rieves or Cloud 9 in connection with the sale of products containing CBD in Rutherford County in 2017. No employee, officer, or agent of Rutherford County or the RCSO investigated Rieves or Cloud 9 in connection with the sale of products containing CBD in Rutherford County. Neither Fitzhugh nor any employee, officer, or agent of Rutherford County or the RCSO participated in any way in obtaining or executing the search warrant in September 2017, seizing merchandise from Cloud 9, or sending the seized samples to the TBI.

### B. Operation Candy Crush

Operation Candy Crush was a multi-agency law enforcement operation the participants of which included the Rutherford County DA's Office, the RCSO, and the SPD, among others. RCSO Detective Eric Curtis Beane opened an investigation by the RCSO into the sale of products containing CBD in Rutherford County in February 2017. Operation Candy Crush was conducted at the direction of the Rutherford County DA's Office and, in particular, ADA John Zimmerman, who provided legal advice to, and directed the actions of, law enforcement officers during Operation Candy Crush.

According to a Summary of Investigation prepared in March 2018 by the RCSO Office of Professional Responsibility, "[l]aw enforcement officers have a somewhat special relationship with the District Attorney's Office." (Doc. No. 122-3, at 7.) Pursuant to this relationship, narcotics

detectives with the RCSO "must seek prosecutorial direction and advice throughout the meticulous cases they encounter." (*Id.*) Several RCSO officers had "concerns over the legality of CBD from the very beginning of the investigation"—that is, about whether it was actually illegal. (*Id.* at 5.)

On January 4, 2018, ADA Clyde Farmer sent an email to Detective Beane of the RCSO with a Memorandum explaining that, under Tennessee law, "Industrial Hemp" is excluded from the definition of "marijuana."

On January 11, 2018, ADA John Zimmerman, SPD Chief Kevin Arnold, Detective Beane, ADA Farmer, Officer Elstran, and members of the TBI met at the TBI's headquarters in Nashville. At this meeting, Zimmerman explained that investigators had purchased edible products containing CBD from Rutherford County stores, and he expressed frustration with the slow turnaround time for submissions of samples of these products to the TBI laboratory. A TBI representative, Agent Jimmy Musice, explained that TBI lab tests could not and would not determine whether products containing CBD were illegal, because the tests could not distinguish between CBD derived from industrial hemp as opposed to marijuana, and it would be up to local law enforcement to prove that the substance was actually illegal. Zimmermann asked whether the TBI forensic scientist who analyzed the submissions would testify that the substance was a Schedule VI drug. Musice responded that "under no circumstances" would TBI agree to that request. (Doc. No. 122-14, at 3.) Zimmerman nonetheless instructed the TBI scientist to list a substance as "Schedule VI" if CBD was detected. The TBI agreed to do so with the understanding that the "schedule listing" was "for reference only and not evidentiary in nature." (*Id.*) Musice also recommended to Zimmerman that he proceed with caution on closing and padlocking stores for what could be legal CBD products derived from industrial hemp. Zimmerman insisted that they were going ahead with the case against the stores selling the CBD products. Another detective

noted that the products in question could all be easily purchased on the internet from such sites as Amazon.com, to which the TBI representative responded that, if true, this fact further weighed in favor of proceeding cautiously.

Sometime prior to the January 11 meeting, RCSO Major Bill Sharp contacted TBI Special Agent Bobby Simmons regarding the Candy Crush investigation. Sharp told Simmons that the Sheriff's Office was involved in an investigation of retail stores selling food products that may contain an illegal substance. Major Sharp expressed that he had been informed that these products may not be illegal. He stated that he wanted to put the investigation on hold until they could get some clarification but that the DA's office wanted to move forward.

On January 30, 2019, Sharp met with several RCSO narcotics investigators to discuss an upcoming meeting at the DA's Office. The consensus among the officers with whom he met was that "no one [was] comfortable moving ahead at [that] time." (Doc. No. 122-13, at 2.) Major Sharp attempted to stop the execution of Operation Candy Crush, but the DA's Office went over his head and contacted Sheriff Fitzhugh directly. Fitzhugh then directed Sharp and other narcotics detectives to attend a meeting at the DA's Office on February 2, 2018.

On January 30, 2018, Zimmerman told Elstran that the SPD would be asked to oversee two Smyrna locations during the anticipated Operation Candy Crush raid, including 105 Jefferson Street—Cloud 9's street address.

The February 2, 2018 meeting was attended by ADAs Zimmerman and Farmer, DA Jones, Beane, Elstran, and Sharp, among others. The meeting was contentious. Sharp and other RCSO narcotics detectives expressed concerns about whether the CBD products were actually illegal and about the wisdom of going so far as to physically padlock the stores. Zimmerman responded by talking about the nuisance law and asserting that the store owners would simply come to court on

their court dates, plead guilty, pay the fines, and get their businesses re-opened. He stated: "We will put off the court dates, attorneys will get tired of coming to court and settle." (Doc. No. 122-13, at 2.)

Fitzhugh was aware of the concerns Sharp and several of the RCSO detectives had about whether the CBD products were actually illegal and that they were opposed to going forward with raiding and closing down the stores until they had greater clarification regarding the legality of the CBD products. (Doc. No. 142-2, Mathis Decl. ¶¶ 10, 12.) Fitzhugh ignored these concerns and pushed ahead with Operation Candy Crush.

Also on February 2, 2019, Officer Elstran prepared and signed an Affidavit in Support of Petition for Abatement of Nuisance and Order to Search Premises pertaining to Cloud 9, summarizing his investigation into Cloud 9 and the execution of the search warrant on September 26, 2017. (Doc. No. 111-2, at 18.) The Petition for Abatement of Nuisance to which Elstran's Affidavit was attached was signed by Jones, Zimmerman, and another Assistant District Attorney. (Doc. No. 111-2, at 17.) The Petition itself refers to the investigation conducted by "officials with the Smyrna Police Department" in 2017 and the execution of the search warrant by SPD detectives in September 2017. (*See* Doc. No. 111-2, at 15.) Neither the Petition nor the Affidavit bears the signature of Fitzhugh or any employee or agent of Rutherford County or the RCSO, and neither the Petition nor the Affdavit references any investigation, or any involvement in the SPD's investigation, by Fitzhugh or any employee or agent of Rutherford County or the RCSO. As a result of the Petition for Abatement of Nuisance, Judge Royce Taylor issued a Temporary Injunction and Order to Padlock Premises pertaining to Cloud 9. (*See* Doc. No. 44 ¶¶ 67, 68.)

On February 5, 2018, Officer Elstran presented an indictment to the Grand Jury in support of drug-related charges against Rieves and Cloud 9. Elstran falsely testified before the Grand Jury

that Rieves "unlawfully and knowingly" sold and manufactured "a controlled substance containing [CBD]. a derivative of Marijuana, a Schedule VI controlled Substance." (Doc. No. 22-19.) Neither Fitzhugh nor any other employee or agent of Rutherford County or the RCSO presented testimony or evidence in any Grand Jury or indictment proceedings with respect to Rieves or Cloud 9 in connection with the sale of products containing CBD in Rutherford County. However, it seems clear that similar Petitions for Abatement of Nuisance and indictments based on similar testimony from RCSO officers were issued for the owners of each of the other stores targeted in Operation Candy Crush, and similar Padlocking Orders were issued by Judge Taylor.

Also on February 5, Elstran emailed Beane at the RCSO asking: "Can you give me the four addresses in Smyrna [the SPD is] going to and also what you need from us, people wise." (Doc. No. 122-7, at 6.) Beane responded: We will be discussing manpower in the morning . . . I would guess one person per store from your dept (patrol or investigator would be sufficient). I will let you know more tomorrow after we meet." (*Id.*)

On the evening of February 5, 2018, ADA Farmer sent an email to Zimmerman, Jones, and Beane, with an attached list of the twenty-three stores within the 16th Judicial District (encompassing Rutherford County) to be targeted during the execution of the Operation Candy Crush raids. Cloud 9 was listed as one of six target "locations" under the heading, "Smyrna City Limits." (Doc. No. 122-18, at 2.)

On February 7, 2018, Elstran emailed Beane the SPD's "roster so far," attached to which was a list pertaining to the "CBD Operation 2/12/2018." (Doc. No. 122-7, at 2–3.) On the list were "4x Locations in Smyrna RCSO responsibility," and "2x Locations Are SPD Responsibility," one of which was "105 Jefferson St."—Cloud 9's address. (*Id.* at 3.) Elstran sent an updated list the next day identifying the names of the SPD officers who would assist at the four locations that were

the RCSO's "responsibility." (*Id.* at 4–5.) The County Defendants point out that Elstran—an SPD officer—created these lists. They assert that the entire email thread makes it clear that Elstran was seeking guidance from Beane only regarding staffing at the four addresses in Smyrna that were part of the RCSO's responsibility but with which the SPD would assist. (*See* Doc. No. 130, Def.'s Resp. to Pl.'s Statement of Additional Facts No. 34.) Elstran did not request guidance related to the two locations (one of which was Cloud 9) that were the SPD's sole responsibility, and only SPD officers staffed the raids on those two locations.

On February 9, 2018, the RCSO held an Operation Candy Crush briefing that was attended by Fitzhugh, Zimmerman, and unidentified others. The briefing presentation, which appears to be a PowerPoint created by RCSO Detective Beane, misinformed the attendees that CBD was an illegal substance. (Doc. No. 122-7, at 15–16; *see also* Doc. No. 130, Def.'s Resp. to Pl.'s Statement of Additional Facts No. 36.) The presentation stated that "undercover purchases by RCSO and Smyrna Police have confirmed similar products are being sold at multiple establishments within Rutherford County" and that "Smyrna Police have located an establishment that manufactures other similar products." (Doc. No. 122-7, at 16.) The presentation further stated:

- Through cooperation with the District Attorney General's Office, RCSO, and Smyrna Police have indicted numerous individuals responsible for the sale of these CBD products.

- This joint operation had resulted in the issuance of Padlocking Orders for 23 separate businesses . . . throughout Rutherford County, to include Smyrna, LaVergne, and Murfreesboro.

- The execution of the Padlocking Orders will take place Monday, February 12, 2018. During these executions, indictments of the owners will be served.

(*Id.* at 17.)

The plaintiff represents that, during this briefing, "Team Leaders" responsible for carrying out the searches, seizures, and padlocking at each of the twenty-three targeted businesses were

designated. (Doc. No. 130, Pl.'s Statement of Fact No. 36.) The County Defendants object to this characterization of the PowerPoint presentation, noting that the presentation related only to the twenty-one stores that were the responsibility of the RCSO during the February 12, 2018 raid. They point out that the names and businesses addresses of the twenty-one "Locations," listed on the slide at Doc. No. 122-7, at 40 (Bates No. RC 000084), are redacted from the exhibit pursuant to Tenn. Code Ann. § 40-32-101, because the information pertains to the other plaintiffs whose claims have been dismissed and whose underlying criminal records have been expunged. (Doc. No. 130, Def.'s Resp. to Pl.'s Statement of Additional Facts No. 36.) The PowerPoint does not include any reference to the two stores that fell within the SPD's purview, including Cloud 9. The slides identify twenty-one team leaders and the teams designated for the twenty-one locations whose identities and addresses are redacted. Four of the teams include SPD officers (*see* Doc. No. 122-7, at 45–47, 53), presumably for the four Smyrna locations for which the RCSO was taking responsibility. The PowerPoint included several slides on "Team Leader Procedures," listing the items the officers should search for and directing them to fill out the "provided checklist to ensure the same procedures are uniformly completed for all locations." (Doc. No. 122-7, at 34.)

The raids that were the culmination of "Operation Candy Crush" took place on February 12, 2018 as planned, with teams of officers from the SPD, RCSO, and other law enforcement agencies[4] conducting raids on twenty-three stores in Rutherford County. As part of the operation, the SPD executed a search warrant at Cloud 9. The SPD alone obtained and executed the search warrant at the direction of ADA Zimmerman. The SPD officers who executed the search warrant

---

[4] Based on the designations noted on the PowerPoint presentation on February 9, 2018, in addition to officers from RCSO and SPD, agents from the TBI, LaVergne Police Department, Murfreesboro Police Department, DEA, BATF, and FBI also took part in the operation. (*See* Doc. No. 122-7, at 41–61.)

also executed Judge Royce Taylor's Order to Padlock Premises pertaining to Cloud 9, and they arrested Rieves. Following his arrest, Rieves was taken to the Rutherford County Adult Detention Center, booked, and later released. The indictment and nuisance petition brought against him were eventually dismissed.

Neither Fitzhugh nor any other employee, officer or agent of Rutherford County or the RCSO was involved in obtaining the search warrant for Cloud 9, in executing the search warrant at Cloud 9 on February 12, 2018, in executing a padlocking order pertaining to Cloud 9, or in arresting Rieves. Neither Sheriff Fitzhugh nor any employee, officer, or agent of Rutherford County or the RCSO directed the actions of Officer Elstran or any other employee, officer, or agent of the Town of Smyrna or the SPD regarding the investigation, search, seizure, or prosecution of Rieves or Cloud 9. The SPD's investigative file pertaining to Rieves and Cloud 9, as of December 2018, contains no mention of any investigation or other involvement by Fitzhugh or any other employee, officer, or agent of Rutherford County or the RCSO. However, Sharp testified that his understanding of Operation Candy Crush was that it was a RCSO operation in which other agencies assisted. (Sharp Dep. 87.) He agreed that RCSO "shares concurrent jurisdiction for law enforcement within the City of Smyrna." (*Id.*)

Immediately after the raids, Sheriff Fitzhugh, SPD Police Chief Arnold, Murfreesboro Police Department Chief Mike Bowen, and DA Jones conducted a press conference, during which Fitzhugh announced that "teams of officers" from the SPD, RCSO, and other law enforcement agencies had "conducted raids on 23 stores selling products resembling candy and containing a marijuana derivative," that all twenty-three stores had been "padlocked on orders from the Court," and that indictments had been issued for the owners of each of the stores. (Doc. No. 122-20, at 2.) He explained that detectives from the SPD and the RCSO, acting undercover, had purchased

products containing CBD "and other synthetic drugs" from all twenty-three stores and that the investigation was "ongoing" at the time. (*Id.*) Immediately following the press conference, Fitzhugh held up a package of gummy candy and explained to a reporter that "they take these candies, they take them out of the package, they spray them with this illegal substance, and then they repackage them." (*Id.* at 15.) The RCSO's Facebook page made a similar announcement about the raid and Operation Candy Crush, quoting Sheriff Fitzhugh as stating that the stores were marketing illegal items toward minors and that some of the products at issue contained synthetic drugs that had been the confirmed cause of two deaths in the United States. (Doc. No. 122-28.)

On February 14, 2018, Zimmerman sent an email to Beane, Elstran, SPD Sheriff Arnold, and various other officers, advising them that twelve of the business owners arrested during the raids intended to plead guilty and to agree to permanent injunctions so that they could reopen their businesses. (Doc. No. 122-7, at 14.) Zimmerman instructed the various agencies to submit "overtime costs" and "out of pocket expenses" so that these amounts could be extracted from the store owners before they were permitted to reopen their businesses. (*Id.*) Both the RCSO and the SPD independently maintain "Drug Funds" where fines, forfeitures, and penalties from drug arrests are held for the benefit of the respective law enforcement organizations.

## III.  STANDARD OF REVIEW—RULE 56

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary

under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record—including, *inter alia*, depositions, documents, affidavits, or declarations— that it believes demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018); Fed. R. Civ. P. 56(c)(1)(A). The non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Pittman*, 901 F.3d at 628. The court must view the facts and draw all reasonable inferences in favor of the non-moving party. *Id.* Credibility judgments and weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018).

## IV.    DISCUSSION

As set forth above, the County Defendants argue first that the plaintiff lacks standing to bring claims against them. The court rejects that argument out of hand, as it is effectively coextensive with the defendants' argument that the claims against them fail as a matter of law, based on a lack of evidence that Fitzhugh was personally involved in the actions giving rise to the plaintiff's claims or that a policy or custom of Rutherford County caused his injuries. In other words, the operative question is not whether the plaintiff has standing to bring his claims—he clearly does. He suffered a violation of his constitutional rights and resulting damages, and he attributes his injury to Sheriff Fitzhugh and Rutherford County. *See Buchholz v. Meyer Njus*

*Tanick, PA*, 946 F.3d 855, 861 (6th Cir. 2020) (to establish standing, the plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision" (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). The question is whether he has sufficient facts to prove his claims against the County Defendants, and, therefore, to survive summary judgment.

### A. Section 1983 – Legal Standards

A plaintiff must prove two elements to prevail on a claim under 42 U.S.C. § 1983: (1) that he was deprived of a right secured by the Constitution or laws of the United States; and (2) that the deprivation was caused by a person acting under color of law." *Robertson v. Lucas*, 753 F.3d 606, 614 (6th Cir. 2014). "Given § 1983's roots in the common law of torts," the Sixth Circuit has applied "two traditional tort principles" to § 1983 claims: (1) "a § 1983 plaintiff generally must prove both that a defendant was personally at fault"; and (2) the plaintiff must show that "the defendant's culpable conduct (not somebody else's) caused [his] injury." *Pineda v. Hamilton Cty.*, 977 F.3d 483, 490 (6th Cir. 2020).

This first principle is generally construed to mean that *respondeat superior* theories do not apply under § 1983. Instead, a plaintiff must show that "each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)). "Each defendant must be 'personally involved' in the unconstitutional action." *Id.* (quoting *Burley v. Gagacki*, 729 F.3d 610, 619 (6th Cir. 2013)). The second principle, applied in the § 1983 context, means that the plaintiff must furnish "proof of a causal connection between the defendant's unconstitutional action and the plaintiff's injury"—that is, "proof that the defendant subject[ed], or cause[d] to be subjected, the plaintiff to a constitutional deprivation." *Id.* at 490–91 (internal quotation marks and citations omitted; alterations in original).

This principle applies to high-ranking local officials, who may be personally liable only if their own unconstitutional actions caused the plaintiff's injury. *Pineda*, 977 F.3d at 494.

Section 1983 claims may be brought against a municipality such as Rutherford County. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691–95 (1978). Because *respondeat superior* does not apply, a municipality cannot be liable simply because municipal employees violate § 1983. Rather, a plaintiff may hold a municipal entity liable under § 1983 only "if the entity's own unconstitutional policy or custom caused the plaintiff's injury." *Pineda*, 977 F.3d at 494 (internal quotation marks and citation omitted). In addition, however, when action is taken by a high-ranking official, one who has the "final authority to establish municipal policy with respect to the action ordered," the municipality may be liable for that action. *Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993) (quoting *Pembaur v. City of Cincinnati,* 475 U.S. 469, 481 (1985)).

To make out a claim for conspiracy to deprive him of his constitutional rights under § 1983, a plaintiff must show "that (1) a single plan existed, (2) the conspirators shared a conspiratorial objective to deprive the plaintiff[] of [his] constitutional rights, and (3) an overt act was committed in furtherance of the conspiracy that caused the injury." *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014). The Sixth Circuit has also recognized generally that "[e]xpress agreement among all the conspirators is not necessary to find the existence of a civil conspiracy" and that "[e]ach conspirator need not have known all of the details of the illegal plan or all of the participants involved." *Hooks v. Hooks*, 771 F.2d 935, 944 (6th Cir. 1985).

### B. Discussion

To be clear: the plaintiff does not assert against the County Defendants any claim based on the search warrant executed at his business in September 2017. He seeks to hold them liable only for the Fourth Amendment violations that occurred during the raid on his business in February 2018, when, without probable cause, his business was padlocked and he was arrested and booked

on drug sale and manufacture charges. For their part, the County Defendants do not actually contest, for purposes of the Motion for Summary Judgment, the plaintiff's allegations that he was arrested without probable cause and subjected to false arrest and malicious prosecution in violation of his constitutional rights. Instead, they argue that Sheriff Fitzhugh was not personally involved in, and did not cause, the alleged violations of the plaintiff's constitutional rights

The basic facts relating to the County Defendants are not disputed. As set forth above, there is no dispute that neither Sheriff Fitzhugh nor any other RCSO officer, employee, or agent was personally involved in obtaining the Petition for Abatement of Nuisance pertaining to Cloud 9, procuring the Temporary Injunction and Order to Padlock Premises pertaining to Cloud 9, obtaining or executing the search warrant on Cloud 9 on February 12, serving the Order to Padlock Premises, padlocking the doors of Cloud 9, arresting Rieves, transporting him to the Rutherford County Detention Center, or booking him. The plaintiff concedes that neither Fitzhugh nor any other Rutherford County employee, officer, or agent directed the actions of Officer Elstran or any other officer, agent, or employee of the SPD regarding these actions and, further, that he had no authority to direct Elstran or any employee of the SPD.

At the same time, it also appears to be undisputed for purposes of the Motion for Summary Judgment that the entire Operation Candy Crush was a joint operation among the RCSO and the police departments of the different municipalities within Rutherford County, including the SPD as well as the Murfreesboro and LaVergne Police Departments and other agencies, acting largely under the direction of Rutherford County DA Jones and ADA Zimmerman. Major Sharp testified that Operation Candy Crush was a RCSO operation in which the other agencies participated. Here, the plaintiff has presented evidence in support of all of the elements of a broad conspiracy: that Operation Candy Crush constituted a single plan covering all twenty-three stores targeted in the

raids; that the conspirators, including (but not limited to) DA Jones, ADA Zimmerman, members of the SPD, Fitzhugh, and individual members of the RCSO, shared a common objective to raid and padlock all twenty-three stores, despite the lack of probable cause; and that overt acts were committed by the defendants in furtherance of the conspiracy to prosecute all of the store owners collectively. There is substantial evidence that Fitzhugh was aware of, authorized, and condoned the operation and that he ratified it after it occurred.

Notwithstanding this evidence, the problem confronting the plaintiff is that he has conceded that neither Fitzhugh nor any other RCSO employee was personally involved in investigating Cloud 9, determining that Cloud 9 was selling illegal products, filing the Nuisance Abatement Petition against Cloud 9, obtaining the indictment or Order to Padlock pertaining to Cloud 9, or serving the Order and search warrant on the plaintiff, arresting him, or actually padlocking Cloud 9. Nor did Fitzhugh direct officers with the SPD to take those actions. In other words, although Fitzhugh was generally aware of the operation and was in apparent agreement with the decision to go forward with the raids on February 12, 2018, the plaintiff has effectively admitted that Fitzhugh was not personally involved in any of the actions that allegedly deprived *him* of his constitutional rights, as required to establish § 1983 liability, for purposes of the substantive individual-capacity § 1983 claims against Fitzhugh.

In addition, the Sixth Circuit appears to have held that, in the § 1983 context, unlike perhaps in other contexts, if the plaintiff cannot show a defendant's personal involvement in the § 1983 violations that affected the plaintiff, then that defendant cannot be liable for conspiracy to violate the plaintiff's rights. Thus, in *Webb v. United States*, 789 F.3d 647 (6th Cir. 2015), one of the very few cases located by the court that has a remotely analogous fact pattern to that presented here, two plaintiffs sued a number of different law enforcement agents, from various state and federal

agencies, asserting claims under *Bivens* and § 1983 for malicious prosecution, false arrest, fabrication of evidence, and conspiracy to deprive them of their civil rights. On summary judgment, the court permitted the two plaintiffs' conspiracy claims against some of the defendants to proceed, but only as to those defendants against whom they had also successfully presented proof of personal involvement in substantive violations of the plaintiffs' rights. Regarding the other defendants, the court stated:

> The Plaintiffs' § 1983 and Bivens conspiracy claims against the remaining individual Defendants fail because those claims rely exclusively on misconduct in the wider Operation Turnaround context. Webb and Price were required to show that the remaining individual Defendants shared a common plan to violate *their* constitutional rights. While the remaining individual Defendants may have been involved in framing other Operation Turnaround targets, Plaintiffs produced no evidence that any of them personally participated in framing Webb or Price, and therefore it cannot be inferred that these Defendants joined in a common plan to frame Webb or Price.

*Id.* at 671 (internal citation omitted).[5]

Here, SPD officers apparently participated jointly with the RCSO and other officers in the raids on four of the other Smyrna locations, but, conversely, no RCSO officers were involved in the raid on the plaintiff's business. While the claim against the County Defendants is slightly different from those in *Webb*, insofar as Fitzhugh was a supervisory official, there is simply no evidence that he was personally involved in, supervised, or directed the decision to proceed against the plaintiff and his business *per se* or that he had any authority to direct the activity of the SPD officers who did. That is, the plaintiff "produced no evidence that [Fitzhugh or any officer under

---

[5] Operation Turnaround actually spurred a number of lawsuits by other individuals targeted by the "corrupted investigation into the Mansfield, Ohio, drug trade." *Robertson v. Lucas*, 753 F.3d 606, 610 (6th Cir. 2014); s*ee also Brown v. United States*, 545 F. App'x 435 (6th Cir. 2013); *Mott v. Mayer*, 524 F. App'x 179 (6th Cir. 2013).

his direction] personally participated in [maliciously prosecuting] [Rieves], and therefore it cannot be inferred that [Fitzhugh] joined in a common plan" to violate Rieves's rights. *Id.*

Under these circumstances, the individual-capacity claims and the conspiracy claims against Fitzhugh fail because the plaintiff has not established Fitzhugh's personal involvement in the actions giving rise to his injuries. Likewise, the official-capacity claims against him fail, because the plaintiff cannot show that Fitzhugh, acting in his official capacity as a final decision maker for the RCSO, took any action that actually caused the plaintiff's injuries. Having reached this conclusion, the court does not reach Fitzhugh's qualified immunity argument.

## V. CONCLUSION

For the reasons set forth herein, the court will grant the County Defendants' Motion for Summary Judgment. Because the court is troubled by this outcome and the application of *Webb* in this context, and because the court is of the opinion that this ruling "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation," the court will so state in the order accompanying this Memorandum, thus authorizing the plaintiff to apply to the Sixth Circuit Court of Appeals for leave to pursue an interlocutory appeal. 28 U.S.C. § 1292(b); Fed. R. App. P. 5(a)(1).

An Order consistent with this Memorandum is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge